**WYNNE LAW FIRM**
EDWARD J. WYNNE (SBN 165819)
ewynne@wynnelawfirm.com
GEORGE R. NEMIROFF (SBN 262058)
gnemiroff@wynnelawfirm.com
80 E. Sir Francis Drake Blvd., Suite 3G
Wood Island Larkspur, CA 94939
Telephone: (415) 461-6400/Facsimile: (415) 461-3900

**SHAVITZ LAW GROUP, P.A.**
GREGG I. SHAVITZ (admitted *pro hac vice*)
gshavitz@shavitzlaw.com
CAMAR JONES (admitted *pro hac vice*)
cjones@shavitzlaw.com
ALAN L. QUILES (admitted *pro hac vice*)
aquailes@shavitzlaw.com
951 Yamato Road, Ste. 285
Boca Raton, FL 33431
Telephone (561) 447-8888/Facsimile (561) 447-8831

[Additional counsel listed on following page]
Attorneys for Plaintiffs and the Putative Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE ADELMAN, ELIZABETH ANDERSON, ELLESSE ANDERSON, JEFFREY BELLOWS, KATHARINE BUTLER, CHEYENNE CHITRY, CHRISTINA DENTON, JACQUELINE FOSTER, JAMES HANCOCK, DONNIE HYSO, CASEY MCKAY, HANNAH ROTHSCHILD, CASSANDRA SWEENEY AND MICHAEL WHITER, individually and on behalf of all others similarly situated, | CASE NO. 3:20-cv-01178-JD |
| | **CLASS ACTION** |
| | **DECLARATION OF JEFFREY S. PETERSEN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Plaintiffs, | |
| vs. | Date:       May 4, 2023<br>Time:       10:00 a.m.<br>Judge:      Honorable James Donato<br>Ctrm:      11 (19th floor) |
| STARBUCKS CORPORATION, | |
| Defendants. | Complaint filed:    June 27, 2019<br>Removal date:     February 14, 2020<br>Trial date:         October 23, 2023 |

PETERSEN DECLARATION IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-01178-JD

**COHELAN KHOURY & SINGER**
MICHAEL D. SINGER (SBN 115301)
msinger@ckslaw.com
MARTA MANUS (SBN 260132)
mmanus@ckslaw.com
605 C Street, Suite 200
San Diego, CA 92101
Telephone: (619) 595-3001/Facsimile: (619) 595-3000

**DAVTYAN LAW FIRM, INC.**
EMIL DAVTYAN (SBN 299363)
support@davtyanlaw.com
880 E. Broadway
Glendale, CA 91205
Telephone: (818) 875-2008/Facsimile: (818) 722-3974

# Luke Adelman, et al. v. Starbucks Corporation

United States District Court
Northern District of California
Case Number: 3:20cv-01178-JD

Report of Plaintiffs' Survey Expert for Class Certification

December 20, 2022

Jeffrey S. Petersen, Ph.D.
Allman & Petersen Economics, LLC
7677 Oakport Street, Suite 610
Oakland, CA 94621
(510) 382-1550
www.allmaneconomics.com

**TABLE OF CONTENTS**

I.   Assignment and Summary of Pilot Survey                                          4

     Assignment                                                                    4

     Summary of Pilot Survey                                                        4

II.  Professional Qualifications                                                      7

III. Sample Survey Regarding Personal Cell Phone Usage for Work-Related
     Communications                                                                12

     Sample Surveys in Litigation                                                  12

     The Duran Decision and the Sample Survey of the Class Members in
     this Case                                                                     14

     The Legal Foundation for Surveys in Class Action Wage and Hour Cases            15

     The Legal Foundation for Utilizing Averages from Survey Results to Project      18
     Class-Wide Damages

     Sampling Plan for Survey and Statistical Analysis                              19

     Research Objectives                                                            21

     Mode of Data Collection                                                        21

     Sampling Frame                                                                 22

     Construct and Pre-test Survey Instrument                                       24

     Design and Select Sample                                                       32

     Recruit and Measure Sample                                                     35

     Code Data                                                                     36

     Perform Analysis of Data                                                       36

IV.  How the Survey Data can be Used to Extrapolate to the Class                      38

     Assessing Bias in the Survey Average due to Nonresponse                        40

     An Example of a "Gold Standard" Validation of a Survey Response Average         43

V.  Results of the Pilot Survey                                                    44

VI.  Conclusion                                                                    58


**LIST OF TABLES AND FIGURES**

Table 1: Employment Status of the Survey Participants                              46

Table 2: Responses to Survey Questions about Cell Phone Usage for Work            48

Table 3: Responses to Survey Questions about Off-the-Clock Work                    51

Table 4: Responses to Survey Questions about Cell Phone Usage During Meal Breaks   54

Table 5: Responses to Survey Questions about Cell Phone Usage During Rest Breaks   55

Table 6: Summary of Survey Questions Used for Statistical Purposes                 57


Figure 1: Survey Design and Process                                               20


3

**I.  Assignment and Summary of Pilot Survey**

*Assignment*

1.  I have been retained by the Wynne Law Firm and Cohelan, Khoury & Singer in *Luke Adelman, et al. v. Starbucks Corporation, et al.* (hereafter "this matter") as a survey expert for class certification and trial.  My first assignment in this matter was to assess whether a survey of store managers and assistant managers (hereafter "store managers") can be utilized to provide valid and reliable data for assisting the trier-of-fact with determining liability, damages and penalties regarding unreimbursed work-related expenses related to personal cell phone use, off-the-clock work, and interrupted meal and rest periods.  I determined that a survey will likely yield valid and reliable data for the issues noted above.  Based on this finding, my second assignment was to conduct a pilot survey for the class certification phase of this matter.  Following class certification, my assignment will be to conduct the full survey for the trial phase of this matter.

*Summary of Pilot Survey*

2.  To date, I have collaborated with Davis Research on a pilot survey of the aforementioned issues in this matter.  I designed the survey instrument and Davis Research administered the survey to randomly selected putative class members compromised of current and former Starbucks store managers.  Davis Research obtained fifteen survey responses during the pretest of the survey instrument from November 14-15.  Davis Research obtained an additional 37 survey responses from November 18-22.  Therefore, the total number of survey responses for the pilot survey is 52.

3.  The results of the pilot survey are as follows:

- 100 percent of the survey respondents stated that they used their personal cell phone for their work at Starbucks,

- 100 percent of the survey respondents stated that their personal cell phone had to be available to perform their job duties,[1]

- 86 percent of the survey respondents did not, or did not recall, receiving any reimbursement,

- 14 percent of the survey respondents stated that they received some reimbursement for the use of their personal cell phones,

- 4 percent of the survey respondents stated that they have been fully reimbursed for the use of their personal cell phone for Starbucks work,

- 98 percent of survey respondents performed off-the-clock work involving their personal cell phone,

- the average weekly amount of off-the-clock work on their personal cell phone was 3.5 hours,

- the percentage of meal and rest breaks that were interrupted by work-related communications was 15 and 22 percent, respectively.[2]

4. The sample size of 52 survey responses is large enough to draw the following conclusions about class-wide issues in this matter:

- Nearly all, or all, of the class members used their personal cell phones for their work at Starbucks.

---

[1] Survey participants were read four job duties where they may have needed to have their personal cell phones available. All survey participants agreed that at least one of the job duties required their cell phone be available.
[2] These percentages account for the communications where the expectation was to respond during the break.

- Nearly all, or all, of the class members needed their cell personal cell phones to be available during their work shifts to carry out their job duties.

- A significant majority of the class members (likely more than 90 percent)[3] have not been fully reimbursed for expenses associated with using their cell phones at work.

- A significant majority of the class members performed (more than 90 percent)[4] off-the-clock work utilizing their personal cell phones.

5. The next phase of the survey is to collect an additional 498 survey responses. This will result in a full sample size of 550 survey responses. This sample size was determined based on court decisions in *Bell v. Farmers Insurance*[5] and *Duran v. U.S. Bank Nat. Assn.*[6] In *Bell*, the Court accepted a ten percent margin of error and rejected a 32 percent margin of error. Due to this decision, a ten percent margin of error is often referred to as the *Bell Standard*. Based on the responses from the pilot survey, a sample size of 550 will yield a margin of error of ten percent or less for the survey responses to be used for the calculation of damages. The responses to the survey questions that the trier-of-fact may find useful in the determination of liability will all have margins of error of fewer than five percent.

6. Section III of this report provides the detailed plan for how the pilot survey instrument was developed and implemented. Section III also shows how the final survey results – the 550 survey responses -- can be tested for potential response bias. Section IV shows how the survey questions can be utilized to extrapolate class-wide damages and penalties. Section IV also shows

---

[3] Based on binomial statistical analysis. Source: McClave, James and Terry Sincich, *Statistics, 13th Edition*, Pearson: Boston, 2017, p.201-205.

[4] Ibid.

[5] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.

[6] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.

the data that is being collected to assess the potential for nonresponse bias. Section V shows the results of the pilot survey.

## II. Professional Qualifications

7. My resume, fee schedule and list of trials and depositions in the last four years are attached as Exhibit A. I received a Ph.D. in economics from the University of Utah. My primary fields of expertise are labor economics, statistics, survey methodology and forensic economics. My publications in the fields of labor economics, forensic economics, survey science and statistics have been cited 158 times according to Google Scholar. I have publications in the following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of Policy Analysis and Management, and the American Journal of Industrial Medicine. In addition, I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[7]

8. I am an adjunct associate professor of economics at St. Mary's College in Moraga, California where I teach graduate and undergraduate economics courses. I am the Vice President of the American Academy of Economic and Financial Experts (AAEFE). AAEFE was founded in 1988 and is devoted to the advancement of research and methodology in forensic economics.

9. I have substantial expertise in projecting class-wide damages based on conducting surveys and utilizing inferential statistical analysis, i.e., using the data sample of survey responses to project to a larger population. My experience is in the form of academic qualifications and litigation consulting experience.

---

[7] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

10.  I am the lead author of peer-reviewed journal articles regarding survey methodology and statistical analysis in class action wage and hour cases.  The title of the articles and the citations are below:

- "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

- "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015.

The article on survey methodology describes the unique aspects of conducting surveys in wage and hour class actions and remedies for potential bias among the survey respondents.  The article on margin of error describes how to project class-wide damages from survey data and protect defendants from overpaying.

11.  I have conducted surveys in 21 class actions and nineteen of the surveys were in wage and hour cases.  In the class action wage and hour class case *Kristal Nucci et al. v. Rite Aid Corporation*, the Honorable Judge Lucy H. Koh cited the results of a pilot survey I conducted in her order for class certification.[8]  Judge Koh writes, "Dr. Petersen's expert report and underlying survey demonstrate that whether a common policy was communicated across all class members is capable of class-wide resolution.  Importantly, these common questions are not merely peripheral, but rather, go directly to liability on a class-wide basis."[9]  In another wage and hour case where I conducted a survey, *Li et al. v. A Perfect Day Franchise Inc.*,[10] Judge Koh presided and accepted the survey results as the basis for awarding damages.[11]

---

[8] *Kristal Nucci, et al. v. Rite Aid Corporation, et al*.  Case number 19-CV-01434-LHK.  Order Denying Motion to Strike and Granting Class Certification.
[9] Ibid, p.26.
[10] Case number 5:10-CV-01189-LHK.
[11] Judge Koh writes in the decision, "Plaintiffs engaged the firm of Allman & Petersen Economics, LLC to conduct a survey of the class and prepare an expert report as to the monetary compensation due to the class. That survey and report are described in detail in the Declaration of Jeffrey S. Petersen. *See* Petersen Decl. ¶¶ 3-26 & Ex. C. Plaintiffs' experts, relying on data collected from surveyed class members, and using generally acceptable statistical methods,

12.  In the federal case titled *Coleman v Brown*, I was designated as the survey expert in a Special Master research team appointed by the Honorable Kimberly Mueller.[12]  My role was to supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

13.  I was trained in survey protocol, survey design, and survey question writing during my employment with the United States Government Accountability Office (GAO) as a Senior Economist.  The GAO is the non-partisan research entity for members of Congress.  I have also conducted a survey outside of litigation during my tenure as a postdoctoral fellow at the University of California, Berkeley.  I designed the survey and oversaw the administration to the survey participants who were trauma victims treated at San Francisco General Hospital.  The results of the survey were presented at the American Association for the Surgery of Trauma annual meeting and published in the conference proceedings.[13]

14.  I have given presentations at eight professional conferences of survey experts, statisticians and damages experts regarding conducting surveys in class action wage and hour cases and projecting damages from the survey responses.  I have also presented to attorneys on surveying in wage and hour class actions in light of the U.S. Supreme Court Decision in *Tyson Foods v. Bouaphakeo*.  The titles of the presentations and the conferences are listed below:

- "Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing, Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

- "Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, June 2022.

---

calculated the average payments due to the class for each of the class claims as well as PAGA penalties. Petersen Decl. ¶¶ 17-20 & Ex. C ¶¶ 10, 14, 17A, 17B. The Court is satisfied that Plaintiffs have met their burden of establishing an approximate award based on reasonable inferences provided by a representative sample of the class."

[12] *Ralph Coleman, et al. v. Edmund Brown, Jr, et al.*  Case number 2:90-cv-0520 KJM KJN P.

[13] Petersen, Jeffrey S., L. Papadakis, D. Morabito, A. Boccellari, R.C. Mackersie "Return Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, p.223.

- "Wage and Hour Surveys: Assisting With the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Conference of the American Academy of Economic and Financial Experts, April 2021.

- "Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020.

- "The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

- "Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

- "The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

- "Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

- "Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Conference of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

15.  I have published two peer-reviewed journal articles that utilize inferential statistical analysis from survey data.[14],[15]  According to Google Scholar, one of the articles has been cited 93 times.

16.  I have worked on 113 class action cases as a survey expert, statistical expert, or damages expert.[16]  The breakdown between plaintiff and defense retentions in these cases is 88 percent for plaintiffs and 12 percent for defendants.  I have testified at trial for both plaintiffs and defendants

---

[14] Petersen, Jeffrey S. and Craig Zwerling, "Comparison of Health Outcomes Among Older Construction and Blue Collar Employees in the United States," *American Journal of Industrial Medicine*, Volume 34, Number 3, 1998.

[15] Petersen, Jeffrey S. and Phillip Allman, "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017.

[16] One hundred and seven of these cases were wage and hour.  I wrote sampling plans for class certification in 41 of these cases.  In addition to these matters, I have worked on over 3,000 legal cases involving income loss for individual plaintiffs.  Retentions on these matters are approximately two-thirds plaintiff and one-third defendant.

in class action cases.  I have testified at trial three times in class action wage and hour cases where I conducted a survey on behalf of plaintiffs.  I have also testified at trial on behalf of defendants where I analyzed the survey conducted by plaintiffs' expert.

17.  I have worked on over 50 individual wage and hour cases where I conducted a telephone interview with plaintiffs.  I asked the plaintiffs to provide estimates of hours worked, off-the-clock work time, frequency of meal and rest periods, and/or unreimbursed job-related expenses.  The estimates provided by the plaintiffs were subsequently used to project the amount of unpaid wages they may be due.  These interviews have provided me a unique perspective on how to structure a survey in a wage and hour class action.  This one-on-one interaction allowed me to assess what individuals can recall and estimate; and what potential biases may be in the estimates.  I have two important conclusions from this experience.  First, unpaid off-the-clock work time, interrupted meal and rest periods, and not receiving meal and rest periods are distinctive in individuals' memories.  Second, informing the plaintiffs that they may be questioned by the defense about the accuracy of their answers significantly reduces the likelihood of biased responses.

18.  I recently conducted surveys in two class action wage and hour cases where survey respondents were asked about personal use of cell phones for work-related duties.  These two surveys involved sales managers at Staples and agents at Bankers Life.  In both matters, the survey respondents were able to answer questions regarding personal cell phone usage for work requirements.  The methodology for the survey in this matter is comparable to the methodology for the Staples and Bankers Life surveys.

11

**III.  Sample Survey Regarding Personal Cell Phone Usage for Work-Related Communications**

19.  The document titled "Third Amended Complaint" in this matter alleges that Defendants failed to reimburse for work-related cell phone expenses and failed to pay meal and rest period premium wages as a result of having the breaks interrupted by work-related communications.[17] The survey in this matter addresses these issues by asking the class members questions about using personal cell phones for work-related communications during work shifts, during meal and rest periods, and outside of their scheduled work hours (off-the-clock).  This section describes how the survey method will result in valid and reliable survey responses regarding these issues.

*Sample Surveys in Litigation*

20.  Sample surveying is an accepted method in legal proceedings as stated in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (hereafter "*Reference Manual on Scientific Evidence*"):

> *Sample surveys* are used to describe or enumerate the beliefs, attitudes, or behavior of persons or other social units.  Surveys typically are offered in legal proceedings to establish or refute claims about the characteristics of those individuals … As a method of data collection, surveys have several crucial potential advantages over less systematic approaches.  When properly *designed, executed, and described*, surveys (1) economically present the characteristics of a large group of respondents or other units and (2) permit an

---

[17] See pages 3 and 5.

12

assessment of the extent to which the measured respondents or other units are likely to adequately represent a relevant group of individuals or other units.[18]

21. The *Reference Manual on Scientific Evidence* states that surveys are an efficient way to inform the trier-of-fact.  Also, the failure to conduct a survey suggests that survey responses would have been unfavorable to the plaintiff:

> Although surveys are not the only means of demonstrating particular facts, presenting the
>
> results of a well-done survey through the testimony of an expert is an efficient way to
>
> inform the trier-of-fact about a large and representative group of potential witnesses. In
>
> some cases, courts have described surveys as the most direct form of evidence that can be
>
> offered.[19] Indeed, several courts have drawn negative inferences from the absence of a
>
> survey, taking the position that failure to undertake a survey may strongly suggest that a
>
> properly done survey would not support the plaintiff's position.[20,21]

22. The *Reference Manual on Scientific Evidence* also states that attorneys may participate in drafting the survey questions:

> An early handbook for judges recommended that survey interviews be "conducted
>
> independently of the attorneys in the case."  Some courts interpreted this to mean that any
>
> evidence of attorney participation is objectionable.  A better interpretation is that the
>
> attorney should have no part in carrying out the survey.  However, some attorney

---

[18] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.361-362.

[19] Footnote #60 from Reference Manual -- *See, e.g.*, Morrison Entm't Group v. Nintendo of Am., 56 Fed. App'x. 782, 785 (9th Cir. Cal. 2003).

[20] The cases cited that support this issue are found in footnote #61 in the Reference Manual -- Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 695 (2d Cir. 1994); Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 357 (7th Cir. 1983); Medici Classics Productions LLC v. Medici Group LLC, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); Citigroup v. City Holding Co., 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. Feb. 10, 2003); Chum Ltd. v. Lisowski, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).

[21] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.372.

13

involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population.[22]

I typically collaborate with attorneys on the survey questions for the reason noted above – "to ensure relevant questions are directed to the relevant population."  The *Reference Manual on Scientific Evidence* further states that whether attorneys are involved in drafting the questions is largely irrelevant since the "key issues for the trier-of-fact concerning the design of the survey are the objectivity and relevance of the questions on the survey and the appropriateness of the definition of the population used to guide sample selection. These aspects of the survey are visible to the trier-of-fact and can be judged on their quality, irrespective of who suggested them."[23]

***The Duran Decision and the Sample Survey of the Class Members in this Case***

23.  The California Supreme Court's decision in *Duran v. U.S. Bank Nat. Assn.*[24] (hereafter *Duran I*) addresses the use of statistical sampling as a basis for proving liability and damages in wage and hour cases. The *Duran I* decision recognized that statistical sampling may be an appropriate means of proving liability and damages in wage and hour class actions, as well as managing individual issues that could arise, provided that the statistical sampling be developed with expert input and allows the defendant an opportunity to contest the model.  The Court identified several flaws in the methodology of the *Duran I* sampling plan that should be avoided when using surveys and statistical sampling. The three key flaws are: (1) the size of the sample was too small (22 individuals), (2) the sample was not random and resulted in selection bias, and

---

[22] Ibid, p.374.
[23] Ibid, p. 374.
[24] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.

14

(3) the margin of error was too high due to a sample size that was too small. The margin of error that the Court identified as too high was 43.3 percent.

24. The appellate level decision in the *Duran* case (filed January 17, 2018) (hereafter *Duran II*) noted two important flaws regarding survey data that was gathered by plaintiff's survey expert.[25] First, there were substantial differences in responses regarding hours worked between surveys conducted in 2008 and 2015. Second, the margin of error was calculated based on total hours worked instead of overtime hours.

25. The sample survey in this matter will not have the flaws identified in *Duran I*. The sample size will be a large sample that is representative of the population of class members. The sample will be representative of the population because it will be drawn from a process in which every class member that worked twenty shifts or more for Defendants will have an equal likelihood of being selected for the survey.

26. The sample survey in this matter will not have the flaws identified in *Duran II*. First, the reason for the variance in the survey responses in *Duran II* was that the survey respondents were asked different questions about work hours in 2008 and 2015. Therefore, although it appeared there was recall bias, there was no way to assess if there was bias because of the structure of the questions. The margin of error on the *Duran II* survey was 41.0 percent. As noted above, the margin of error for this survey will be ten percent or less.

### *The Legal Foundation for Surveys in Class Action Wage and Hour Cases*

27. The Supreme Court of the United States ruling in *Anderson v. Mt. Clemens Pottery Co.* (United States Supreme Court 1946) shows that estimates of unpaid time can be the basis for

---

[25] *Duran v. U.S. Bank National Association*, Court of Appeal State of California, First Appellate District, Division One, Filed January 17, 2018.

projecting damages.  In the context of a survey, this legal decision shows that the focus of the trier-of-fact when evaluating the survey responses should be on the reasonableness of the estimates provided by the survey participants.  *Mt. Clemens* states employees may provide estimates regarding the issues in question in litigation when there are no employer records available to assess the issues and damages can be projected from these estimates (pp. 687-688):

> The solution [to the lack of employer records] is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

28.  In regard to using personal cell phones for work-related communications, insufficient records exist for assessing whether phones were used for anything other than work-related voice calls during the class period.  The records for voice calls may be potentially useful if the class members know the phone numbers of other Starbucks employees that called them for work-

related communications and if past cell phone records are available.  If class members state during the survey they received work-related calls on their personal cell phone, their cell phone bills may be a potential validation data point.  However, making these determinations may be impracticable for the survey participants.

29.  The trier-of-fact in this matter is in the position of being able to determine if the survey responses can be utilized as a matter of "just and reasonable inference."  The role of the survey expert is to devise survey questions that are unbiased and valid in order to provide the Courts with the best possible data on which to make this determination.

30.  In the matter of *Li v. A Perfect Day*, Federal Judge Lucy Koh used the legal standard set by *Anderson v. Mt. Clemens* when determining liability and damages from sample survey results.  I was plaintiff's survey expert in this matter.  Judge Koh's decision states:

> Where an employer fails to maintain accurate payroll records, an employee carries his burden under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946), superseded by statute on other ground, Portal-to-Portal Act, 61 Stat. 86-87; *see also Brock v. Seto,* 790 F.2d 1446, 1448 (9th Cir. 1986); *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988). The Ninth Circuit has approved "approximated awards where plaintiffs can establish, to an imperfect degree of certainty, that they `have performed work and have not been paid in accordance with the FLSA.'" *Alvarez v. IBP, Inc.,* 339 F.3d 894, 914-15 (9th Cir. 2003) citing *Brock,* 790 F.2d at 1448 (internal quotation marks and alterations omitted). "In such instances, the only uncertainty is the amount of damage, not the fact that damages are due. Where an approximate award based

17

on reasonable inferences forms a satisfactory surrogate for unquantified and unrecorded actual times, an approximated award is permissible." *Id.* (internal quotation marks, citations, and alterations omitted).

Under this burden shifting approach, both the Ninth Circuit and California courts have permitted district courts to award back wages based upon evidence of damages from a representative sampling of class members. *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988); *Amaral,* 163 Cal. App. 4th at 1189 ("*Anderson*'s reasoning has also been applied to permit class action plaintiffs to prove their damages for unpaid overtime by the use of statistical sampling."). Thus, where, as here, Plaintiffs have established liability for unpaid wages (see discussion above), and that Defendants have failed to maintain accurate payroll records, the court can rely on evidence of a representative sampling of class members regarding the damages owed to establish liability as to the class.[26]

### The Legal Foundation for Utilizing Averages from Survey Results to Project Class-Wide Damages

31.  If an average of survey responses is utilized to determine damages, the average will overpay some individuals and underpay other individuals.  An average will always have this result since survey respondents will report values higher and lower than the average.  There is legal precedent that this is acceptable in a class action wage and hour case and the average of survey responses can be utilized to project class-wide damages.  The legal precedent is the decision about sampling and extrapolation in *Bell v. Farmers Insurance*.[27]  The *Duran I* decision stated

---

[26] *Li v. A Perfect Day Franchise Inc.*, United States District Court, Northern District of California, Case No. 5:10-CV-01189-LHK.
[27] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th, 715, 9 Cal.Rptr.3d 544.

18

that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[28]  An average will always be "imperfectly tailored to the facts of particular employees," since the average may not be exactly the same as their individual claim for damages.  However, the *Bell Court* clearly stated this "imperfect tailoring" is preferable to every class member proving their individual damages claim so the courts are not "unduly burdened."

The *Bell Court* stated (p.8):

> It was within trial court's discretion, in class action on behalf of approximately 2,400 claims representatives against an insurance company seeking compensation for unpaid overtime, to use statistical methodology of random sampling and extrapolation for the determination of aggregate class-wide damages; trial court was permitted to weigh the disadvantage of statistical inference, the calculation of average damages imperfectly tailored to the facts of particular employees, with the opportunity it afforded to vindicate an important statutory policy without unduly burdening the courts.

### *Sampling Plan for Survey and Statistical Analysis*

32.  Figure 1 shows the methodology for the design and process of the pilot survey that was conducted in this matter.  This is a well-established methodology as described in *Survey Methodology* by Robert M. Groves.[29]  Dr. Groves is a preeminent survey scientist and he was formerly the Director of the U.S. Bureau of the Census.  Each step of the survey design and process is described below.  This process results in a representative data set that is statistically reliable and valid.

---

[28] *Duran et al. v. U.S. National Bank Association*. 2014.  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

[29] Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., *Survey Methodology*, John Wiley & Sons, New Jersey, 2009.

19

## FIGURE 1: SURVEY DESIGN AND PROCESS[30]



---

[30] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 47.

*Research Objectives*

33.  The research objectives of the survey are as follows:

- determine the percentage of class members who used their personal cell phones to perform their job duties,

- determine the types of job duties that class members used their personal cell phone to perform,

- determine whether personal cell phones had to be available during work shifts and outside of work shifts for these duties,

- determine whether class members have been fully reimbursed for their personal cell phone expenses related to their work at Starbucks,

- determine the frequency and duration of off-the-clock work time related to responding to work-related communications on personal cell phones,

- determine the frequency that class members' meal and rest breaks were interrupted by work-related communications on their personal cell phones.

*Mode of Data Collection*

34.  The pilot survey was administered telephonically by Davis Research.  According to peer-reviewed science on wage and hour surveys, telephone surveys tend to be the preferable method for obtaining survey responses.[31]  I have collaborated with Davis Research on eleven surveys in wage and hour cases where I designed the survey instrument and they obtained the survey responses.  These surveys were conducted telephonically which was an efficient and effective

---

[31] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015.

mode for obtaining the survey responses.  The telephonic method has also proven to be efficient and effective in other wage and hour surveys I have conducted.

35.  In this matter, a mail survey will be problematic as class members who are no longer employed by Defendant may have changed addresses.  This makes verifying whether they received the survey a very difficult endeavor.  An internet-based survey will likely have similar difficulties due to the problem of determining if respondents received the e-mail requesting that they participate in the survey.  A telephone survey is preferable in this matter because it allows for control over the contact with the survey participants with as many follow up calls as needed to attain an acceptable cooperation rate.  A telephone survey also provides the data for an accurate computation of the response rate.

***Sampling Frame***

36.  Sampling frames are lists or procedures intended to identify all elements of a target population.  The target population in this matter will be class members that worked twenty shifts or more for Defendant from April 15, 2019 to the present.  According to *Survey Research Methods* by Floyd Fowler, "Any sample selection procedure will give some individuals a chance to be included in the sample while excluding others.  Those people who have a chance of being included among those selected constitute the sample frame."[32]  The sample frame is evaluated based on: (1) how comprehensively it covers the target population, (2) whether the probability of being selected can be computed, and (3) how efficiently the members of the sample frame can be contacted.[33]  Therefore, the sampling frame goes hand-in-hand with determining the method of data collection.

---

[32] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 15.
[33] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 16.

37.  The class members are the individuals who possess the knowledge to answer questions related to personal cell phone usage for job duties.  Therefore, they are the target population and can be comprehensively covered through a simple random sample.  Every class member who works twenty or more shifts during the class period will have an equal probability of being selected to participate in the survey.

38.  I have used the twenty-shift criteria for inclusion in the sample frame in fourteen wage and hour surveys.  The criterion of working twenty or more shifts ensures that survey respondents have sufficient experience with Defendant's employment policies.  There will not be response bias due to the twenty-shift criteria.  Individuals do not have differential experiences with off-the-clock work based on working more or less than twenty shifts.  The only difference between these groups is that individuals who worked more than twenty shifts are more likely to provide valid and reliable survey responses because they have sufficiently experienced the policies that are the subject of the survey.  The first time I used the twenty-shift criteria was based on a hypothesis that this number of shifts would be sufficient exposure to the work environment to be able to answer survey questions regarding wage and hour issues.  At the culmination of the survey, I included the number of work shifts in the response bias regression equation and did not find that the number of shifts had a statistically significant effect on the survey responses.  Therefore, whether individuals worked 21 shifts or 1,000 shifts, they were not providing differential responses based on their tenure at the employer.[34]  For example, surveys on the frequencies of authorized and permitted rest breaks showed no difference due to work tenure.  In other words, the length of employment had no effect on how many missed rest breaks the survey

---

[34] The exception to this statement is that differential experiences were reported based on tenure when it made sense. For example, in a survey I conducted of Rite Aid employees regarding the amount of purchases to conform to the dress code, employees who work more shifts reported more purchases.

respondents were reporting.  Since the twenty-shift criteria has not resulted in response bias in fourteen prior surveys, as shown by the regression analysis, I continue to use it as a criteria for inclusion in the sample frame.

39.  The only individuals within the sample frame that cannot be contacted for the survey are those whose listed phone numbers are no longer in service and their current phone number cannot be obtained.  According to peer-reviewed research on wage and hour surveys, this is not a potential source of bias since there is no reason an individual without a working telephone number should be any different than any of the other class members.[35]  There is no logical reason that individuals who changed their phone number after departing employment from Defendant would have different employment experiences than individuals that did not change their phone numbers.  Employees are not assigned to different jobs based on whether they changed phone numbers.  Employees are not subjected to different employment policies based on whether they changed phone numbers.  Therefore, changing phone numbers has no correlation with having differential work experiences in this matter.  The sample frame for individuals on the class member list with working telephone numbers is valid based on the three criteria noted above. The target population will be comprehensively covered, the probability of being selected can be calculated, and the sample members can be efficiently contacted.

***Construct and Pre-test Survey Instrument***

40.  The survey instrument is the questionnaire that is administered to the survey participants. The survey methodology textbook *Designing and Conducting Survey Research* states that the

---

[35] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 28.

introduction of the survey instrument should build trust in the survey participants so they will be willing to be forthcoming with information:

> A questionnaire is a conversation, and, like most conversations, it builds on itself, beginning with an introduction.  It is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have.  From the researcher's point of view, there is a need to convince potential respondents that their participation is useful to both the survey's sponsor or client and the respondents themselves.[36]

41.  The *Reference Manual on Scientific Evidence* advises that the double-blind method be utilized "whenever possible."[37]  Therefore, an analysis of whether it is possible to use the double-blind method is warranted.  A double-blind survey would require that the survey respondents be unaware of the survey sponsor and the purpose of the survey.  In other words, the survey respondents are "blind" about the purpose of the survey.  There are many reasons why this method should not be used in a wage and hour class action survey.  The issue of trust between the survey respondent and survey interviewer has become more important over the last decade due to the increase in identity theft and the perception among the general public that identity theft should be a genuine concern.  Therefore, potential survey respondents are not likely to participate in a survey unless they know why the survey is being conducted and how their responses are going to be used.  This is especially the case for individuals who would fear losing their jobs as a result of participating in a survey.  These individuals need to be reassured that

---

[36] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.
[37] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.410-411.

retaliation for participating in a survey is not allowable under the law and legal action will be taken if they are retaliated against.

42.  When a survey respondent is first contacted on the phone it is imperative to gain their trust as noted above.  If a survey is conducted using the double-blind method, the survey interviewer cannot inform the survey respondent why they are calling.  The dialogue would be as follows if a double-blind survey were utilized in this matter:

- (Survey Interviewer) – I am calling to conduct a survey regarding your work experiences with Starbucks.

- (Survey Respondent) – Why do you want this information?  How is it going to be used?  Who are you calling on behalf of?  What is this all about?

- (Survey Interviewer) – Sorry, I cannot answer any of those questions, all I can do is ask you the survey questions.

When the survey respondent does not have these important questions answered they are likely to terminate the call and not participate in the survey.   As noted above, the survey methodology textbook *Designing and Conducting Survey Research* states that during the initial phase of the survey "it is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have."[38] This is why a double-blind survey will not be used in this matter.

43.  The advisable method for conducting the survey in this matter is to make the survey interviewer and the respondents "as blind as possible."  Therefore, the scripted survey introduction will only reveal that the survey is regarding employment issues at Starbucks as part of a litigation matter and the survey participants need to be accountable to defendants regarding

---

[38] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

their responses.  No other information about the litigation will be divulged unless the survey participant expresses concern about participating in the survey and potentially having to be questioned by the defense.  If this occurs, then a script will be read assuring the survey participant that no legal action could be taken against them for participating in the survey.

44.  The recent California Court of Appeals decision in *McCleery v. Allstate Insurance*[39] also shows why double-blind surveys should not be used in wage and hour class actions.  A double-blind anonymous survey was conducted in that matter as the basis for projecting class-wide damages.[40]  The Court's decision in that matter did not allow the survey results to be used to project class-wide damages.  The decision highlights the importance of transparency in conducting surveys in litigation so that the defense can defend itself against claims made against them.[41]   Transparency is also necessary to induce accountability among the survey respondents.  Double-blind surveys do not have transparency and do not impose accountability.  According to peer-reviewed research on class action wage and hour surveys, transparency and accountability are essential parts of survey methodology in wage and hour class actions.[42]

45.  Finally, there is an ethical reason to disclose to the survey participants that the survey is part of litigation.  If a double-blind survey is conducted, survey participants do not know they are participating in litigation.  If the trier-of-fact subsequently requires the survey participants names to be disclosed, which occurred in *Duran*, individuals who were promised anonymity are no longer anonymous.  Their survey responses will be shown to their past or former employer.

---

[39] Court of Appeal of the State of California, Second Appellate District, Division One, Filed 7/1/19.  Los Angeles Superior Court Case BC410865.

[40] Ibid., see page 2.

[41] Ibid., see page 25.

[42] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32.

Individuals should be informed about this possibility and a double-blind survey does not allow this information to be conveyed.

46.  The mental process of answering questions from a survey instrument is generally found in four groups of processes: comprehension, retrieval of information, estimation and judgement, and reporting of an answer.[43]  Comprehension includes both the question being asked and the instructions previously given on the survey instrument.  Therefore, both the question and the instructions must be easily comprehended.  Retrieval is the process of recalling information relevant to answering the question.  Estimation and judgement are the processes of combining or supplementing the recall of information.

47.  In this matter, comprehension of the questions is not likely to be an issue.  The topics are very straightforward and familiar to the survey respondents.  The more difficult issue is the retrieval of information interacting with estimation and judgement.  All of the survey participants have the necessary information stored in their memories since they experienced Defendant's employment policies.  However, in the process of retrieving this information, their process of estimation and judgement may be influenced by their self interest in anticipation of receiving a payout from the litigation.  Therefore, the Defendant in this matter could potentially overpay due to inflated survey responses.  This situation is known as moral hazard which is defined as "any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly."[44]  According to peer-reviewed literature on wage and hour surveys, the solution to self-interest bias and moral hazard in a wage and hour survey is to

---

[43] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 220-222.
[44] Krugman, Paul R. 2009. *The Return of Depression Economics and the Crisis of 2008*. New York: W.W. Norton.

conduct the survey without anonymity and to ensure the survey participants are aware they need to be accountable for the accuracy of their survey responses:

> Survey researchers should assess potential bias among surveyed class members in class action wage and hour cases through the lens of moral hazard.  Moral hazard has been described as 'any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly.'  Survey respondents who are anonymous bear no risk associated with inflating their work hours because there is no accountability.  Anonymous survey respondents can be very costly to the defense because inflated estimates of work hours lead to higher damages.  Survey respondents who are not anonymous bear considerable risk when inflating a work hour estimate.  They might look foolish, and possibly be subject to perjury, if they cannot substantiate their estimate of work hours during a deposition and/or trial testimony.  Informing survey respondents in a class action wage and hour case at the outset of the survey that they may be questioned by the defense about the accuracy of their answers is a useful tool in limiting moral hazard.[45]

48.  To control for the potential of self-interest bias, the following statement will be read to the survey participants during the introduction of the survey:

> This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by the defendants about your answers.

---

[45] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32-33.

49.  The survey questions conform to the U.S. Supreme Court ruling in *Tyson Foods, Inc. v. Bouaphakeo*[46] since individual class members would present answers to these questions to establish liability and damages if they filed a lawsuit regarding their individual claim.

50.  The pretest and pilot survey instruments are attached as Exhibit B.  The pretest survey instrument was administered to fifteen survey participants.  Based on the pretest survey responses, it was determined that the question regarding reimbursement of cell phone expenses needed to be modified.  The question that was changed is 2C in the pretest instrument.  The modified questions are 2C-1 and 2C-2 in the pilot instrument.

51.  The pilot survey asked respondents to provide the following information regarding their employment with Starbucks:

- if they are currently or formerly employed by Starbucks,

- their job title,

- whether they used their personal cell phone to perform their Starbucks job duties,

- the types of job duties that caused them to use their personal cell phone,

- whether they used their cell phone for work-related communications when off-the-clock,

- the types of work-related communications they used their personal cell phone to perform when off-the-clock,

- whether work-related communications came from a district manager, or other supervisor, when they were off-the-clock and how frequent were the communications,

- whether they were ever instructed by a district manager or other supervisor to not perform off-the-clock work,

---

[46] 577 U.S. 136 S. Ct. 1036; 194 L. Ed. 2d 124

- the amount of time they used their personal cell phone for work related communications when off-the-clock,

- whether they used their personal cell phone for work-related communications during their meal and rest breaks and the frequency of use,

- whether responding to work-related communications during meal and rest breaks was a work requirement or voluntary personal choice.

52.  The survey also asked the respondents to provide the following information:

- their level of certainty about the responses they provided in the survey,

- level of education,

- age,

- gender,

- whether they knew anything about a lawsuit involving Starbucks, and if "yes", an open-ended question about what they knew.

The responses to these questions can be utilized to test for bias in the responses as described in the "perform analysis of data" section.

53.  The sample size of 52 pilot survey responses was based on the prescribed range in the *Reference Manual on Scientific Evidence*.[47]  The pilot is utilized to assess question clarity, question comprehensiveness and question acceptability.[48]  Clarity refers to whether the respondents understand the questions.  Comprehensiveness refers to offering survey participants the complete range of alternatives.  Acceptability refers to burdensome questions and/or the

---

[47] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, page 388.

[48] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 38.

invasion of privacy.  The survey questions will be revised following the pilot if clarity, comprehensiveness or burden is an issue.

54.  The survey will be available in languages besides English, if necessary.  Typically, the need to translate the survey into another language is assessed during the pilot phase.  I rely on the survey research firm to report to me if a translation is needed.  To date, Davis Research reported there have not been any language barriers.

### Design and Select Sample

55.  The selection process for the 52 pilot survey participants was a simple random sample.  This is a selection process that allows each member of the sample frame to have an equal probability of being selected for the survey.[49]  The survey participants are the potential class members comprised of current and former Starbucks store managers that worked twenty or more shifts during the class period.  The survey participants were randomly selected from the class contact list provided by Defendants.

56.  The additional 498 survey participants will also be based on a simple random sample.  Based on collaborating with Bill Davis of Davis Research about the sample selection process, the survey will proceed with groups of 1,000 randomly selected potential survey participants.  After the group of 1,000 potential respondents is "exhausted," i.e., Davis Research determines it is unlikely that more survey responses can be obtained from the group, an additional 1,000 potential respondents will be randomly selected.  The full sample size of 550 survey respondents can be obtained on a completely random basis.

---

[49] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 103.

57. The sample size is based on a targeted margin of error.  In wage and hour surveys I have conducted in the past, I have typically targeted the margin of error at five percent for proportional data.[50]  Proportional data refers to survey questions that ask about percentages or a "yes or no" response.  There is no guidance in statistical science quantifying what constitutes a margin of error that is too high with respect to sample survey data in class action cases.  For example, a margin of error that is "too high" is found in a sample mean of survey data of likely voters prior to an election.  If there are only two candidates on the ballot and the sample mean shows one candidate will receive 52 percent of the vote and the margin of error is five percent; then the margin of error is obviously "too high."  The margin of error shows that an outcome could be that this candidate may only receive 47 percent of the vote.  The survey cannot make a prediction about who is likely to win the election.  This type of reasoning does not apply to liability or damages in a class action wage and hour case.  The margin of error is a statistic in a wage and hour case that assists the trier-of-fact by providing information about the magnitude of potential error in the results.  Whether it is "too high" is a subjective assessment to be made by the trier-of-fact when balancing the welfare of plaintiffs and defendants.[51]

58. There is legal precedent that a margin of error of ten percent or less is acceptable in a class action wage and hour case if damages are to be projected from the average of the survey responses.  The legal precedent is the decision about margin of error in *Bell v. Farmers Insurance*.[52]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of

[50] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 165.
[51] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.
[52] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th' 715, 9 Cal.Rptr.3d 544.

representative testimony in an overtime class action."[53]  The peer-reviewed statistical method for projecting damages in a class action wage and hour case when the margin of error is above ten percent is to use the lower bound of the confidence interval.[54]

59.  The formula for determining the sample size when proportions are the data being gathered is as follows[55]:

$$n = (Z^2 (p (1 - p)) N) / (Z^2 (p (1 - p) + (N - 1) ME^2)$$

where,

| | | |
|---|---|---|
| n | = | sample size |
| N | = | population size (i.e., the size of the class) |
| Z | = | Z score for the level of confidence |
| p | = | unknown proportion for the sample |
| ME | = | acceptable margin of error for the proportional variable |

60.  The proportion that requires the largest sample size is 50 percent.  Therefore, to be as conservative as possible in estimating the sample size, 50 percent is inputted into the above equation for the variable "p" if there is no information available.  The "Z score" is associated with the desired level of confidence.  According to the *Reference Manual on Scientific Evidence*, a 95 percent confidence interval is widely accepted among scientists:

---

[53] *Duran et al. v. U.S. National Bank Association*. 2014.  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

[54] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

[55] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 167.

Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[56]

61.  It is my understanding that the proposed class has approximately 6,584 potential members based on the class contact list provided by Defendants in this matter.  These potential class members are current and former Starbucks store managers that worked in California.  A five percent margin of error for the proportional questions would require a maximum sample size of 350 survey responses.

62.  Survey responses that ask about continuous non-proportional issues require a different method for assessing the sample size to achieve the targeted margin of error.  An example of a continuous non-proportional issue in this matter is the average number of hours of off-the-clock work per week.  The pilot survey responses to this question were utilized to determine the sample standard deviation.  Based on the sample standard deviation, it was determined that a sample size of 550 survey responses will yield a margin of error of ten percent or less.

*Recruit and Measure Sample*

63.  This phase of the project refers to implementation of the survey instrument to the survey participants.  To encourage participation, an incentive payment of $10 will be offered for completing the survey.  The American Association of Public Opinion Research (AAPOR) lists incentive payments on their best practices guide:

---

[56] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

35

Specific procedures designed explicitly to stimulate survey cooperation or participation should be considered, such as … offering monetary (i.e., cash) or non-monetary (some other valued reward) incentives to encourage participation.[57]

*Code Data*

64. The survey data was coded by the survey research firm and sent to me in an Excel spreadsheet.

*Perform Analysis of Data*

65. A multiple regression technique that is specifically designed for wage and hour class actions will be utilized to assess potential response bias in the 550 survey responses. The pilot sample size of 52 survey responses is too small to employ this method at this stage of the project. The regression technique is that the survey response is the dependent variable and the independent variables are the following:

- employment status,
- number of shifts worked,
- age,
- level of certainty about response,
- took survey on first or second phone call,
- knowledge of the lawsuit.

---

[57] American Association of Public Opinion Research, "Best Practices for Survey Research," https://www.aapor.org/Standards-Ethics/Best-Practices.aspx.

36

If the coefficients on any of these variables are statistically significant it is a potential indicator of bias. The coefficient can subsequently be used to adjust the survey response such that the bias will be removed.

66. Davis Research will track the number of phone calls placed to the survey participants. The regression equation can be used to test the hypothesis that individuals who may be biased will be "eager" to participate in the survey and will take the survey on the second call attempt after receiving a voicemail regarding the survey. The responses of these potentially "eager" respondents can be compared to the responses of the respondents who respond after more call attempts. Another hypothesis is that individuals that take the survey on the first phone call have the least potential for bias since they have not heard anything about the survey prior to beginning the questions. In every survey I have conducted to date, both hypotheses have been rejected since there was no statistically significant difference in the survey responses between individuals that took the survey with one or two call attempts compared to those who took the survey after many call attempts.

67. Multiple regression analysis is a widely accepted method for determining the effect of different variables on the variable in question as explained in the *Reference Manual on Scientific Evidence*:

> Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable. For example, a multiple regression analysis might estimate the effect of the number of years

of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.[58]

This statistical technique provides results that can be used "in determining whether a particular effect is present and measuring the magnitude of a particular effect."[59]

68.  I am typically provided with the job titles and work locations of the class members when I have been the survey expert in wage and hour class actions.  Assuming I will be provided with this information in this matter, I can assess the statistical representativeness of the survey respondent in terms of job titles and work locations.  This is another method of assessing potential bias.  If the percentages of survey participants match up within statistically valid ranges of the class members in terms of job categories and work locations, then the survey responses are "representative" of the class members.  In other words, there will not be any bias due to the job titles or work locations of the survey respondents.

### IV.  How the Survey Data can be Used to Extrapolate to the Class

69.  The survey is conducted on a sample of the class members.  The data is then used to extrapolate to the remainder of the class.  If the data is valid and reliable, and the margin of error is within acceptable limits, then the extrapolation will result in a measure of class-wide damages that is scientifically valid.  Also, the frequencies of the survey responses will assist the trier-of-fact in determining liability.

---

[58] Rubenfeld, Daniel L., "Reference Guide on Multiple Regression," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.305.
[59] Ibid, p.306.

70. If the margin of error is ten percent or less for unpaid time, then the *Bell Standard* holds that damages can be determined from the sample average. Due to the large population of class members in this matter, the targeted margin of error of ten percent will be obtained.

71. The questioning sequence in the survey instrument will generate a point estimate for a variable of interest in this matter – the duration of off-the-clock work. Aggregating the survey responses for this question results in an estimate of the average hours per week the work was performed. This average can be utilized for determining damages. For example, the average response from the pilot survey was 3.5 hours. This figure can be mapped onto the payroll data to determine unpaid wages.

72. An average survey response that conforms to the *Bell Standard* is a fair and balanced statistic for projecting class-wide damages. The reason it is a "fair and balanced" statistic is that there is an equal probability that damages computed from an average will be too high or too low. Therefore, the probability of overpayment or underpayment is equally shared by plaintiffs and defendants in the litigation.

73. An alternative to projecting damages from the survey average is to use the boundaries of the 95 percent confidence interval. According to peer-reviewed research, using the lower bound of the confidence interval to project damages results in a 97.5 percent probability that defendants are not overpaying for damages.[60] For example, if the average is 3.5 hours per week of off-the-clock unpaid work time and the margin of error is ten percent, the lower and upper bounds of the 95 percent confidence interval are 3.15 hours to 3.85 hours. If the trier-of-fact determines the survey results are valid and reliable, then there is a 97.5 percent probability that defendants will

---

[60] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.149.

not overpay for class-wide damages if 3.15 hours per week is used as the basis for projecting unpaid work time.

74. The survey results and statistical analysis will be provided to the damages expert in this matter to calculate class-wide damages.

*Assessing Bias in the Survey Average due to Nonresponse*

75. It has been my experience in reviewing defense expert reports in class action wage and hour cases where I have conducted a survey is that they claim the responses are biased due to nonresponse. This means that the individuals who took the survey are not representative of the individuals who did not take the survey. However, I have never seen a compelling analysis from these defense experts that nonresponse bias is present in the results. Their arguments usually boil down to the speculative assumption that individuals who have something to gain from the survey are more likely to be willing to participate in the survey. I have never seen any data to suggest this is actually occurring. Moreover, the counterfactual may be more compelling – individuals who want to present favorable information about defendants may be more willing to participate in the survey.

76. As noted above, Davis Research will track the number of calls placed to the survey respondents. Typically, they make at least eight calls to the individuals that have been selected for potential participation in the survey. The number of call attempts to obtain survey responses can be used to assess the differences in responses for individuals who were difficult to get on the phone to take the survey versus those who responded relatively quickly.[61] The individuals who are difficult to contact are more likely to be representative of the individuals who did not take the

---

[61] Freedman, David, Robert Pisani, and Roger Purves, *Statistics, 4th Edition*, New York: W.W. Norton & Company, 2007, page 344.

survey. A correlation analysis can be performed to assess for potential differences in number of calls influencing the survey response. If there is no correlation between the call attempts and the survey responses, it is another indicator that nonresponse bias is not occurring.

77. I also instructed Davis Research to track the individuals who refuse to participate in the survey. Davis Research tracks the point of refusal in the survey instrument and asks for a detailed reason why the individual is refusing to participate in the survey. This method of tracking allows for a statistical analysis of differences in the point of refusal as well as an analysis of the reasons for refusing.

78. The other common criticism among defense experts is that the response rate is too low. The response rate is the number of survey participants divided by the number of individuals attempted to contact to take the survey. However, I have never seen a compelling analysis that the response rate is an indicator of nonresponse bias. The now superseded second edition of the *Reference Manual on Scientific Evidence* (published in 2000) stated that certain response rates needed to be achieved to obtain an unbiased data set. However, during the last two decades, a substantial amount of research has been conducted on response rates and none has found that a specific rate is an indicator of bias. The third edition of the *Reference Manual on Scientific Evidence* (published in 2011) contained none of the language about specific response rates that was in the second edition. The third edition states that "reasonable estimates" can be obtained even if there is a relatively low response rate:

> Contrary to earlier assumptions, surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates. The key is whether

41

nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.[62]

79.  Moreover, one of the preeminent scholars on survey research is Robert Groves[63], and his research clearly shows that response rates do not tell a clear picture of potential bias.  Public Opinion Quarterly, the peer-reviewed journal of the American Association for Public Opinion Research, devoted an entire issue to the subject of non-response bias.  Dr. Groves wrote the lead article titled "Nonresponse Rates and Nonresponse Bias in Household Surveys." In this article, Dr. Groves addresses the issue of whether there is a singular level for a response rate that shows response bias is present.  He concludes definitively that there is not:

> Many surveys of the U.S. household population are experiencing high refusal rates.
> Nonresponse, can, but need not, induce nonresponse bias in survey estimates.  Recent
> empirical findings illustrate cases when the linkage between nonresponse rates and
> nonresponse biases is absent.[64]

Groves further states,

> Assembly of methodological studies whose designs permit estimation of nonresponse
> bias shows that empirically there is no simple relationship between nonresponse rates and
> nonresponse biases. That is, research results comport with the assertion that covariances
> between survey variables and response propensities are highly variable across items
> within a survey, survey conditions, and populations. Hence, there is little empirical

---

[62] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.385.

[63] Dr. Groves was the head of the United States Bureau of the Census from 2009 to 2012 and is currently a professor in the math and statistics department at Georgetown University.

[64] Groves, Robert M., "Nonresponse Rates and Nonresponse Bias in Household Surveys," *Public Opinion Quarterly*, Volume 70, No. 5, Special Issue 2006, page 646.

42

support for the notion that low response rate surveys de facto produce estimates with high nonresponse bias.[65]

80. Based upon my considerable experience in conducting surveys in wage and hour class actions and interviewing more than 50 individuals with wage and hour claims, the most likely reason that people don't participate in wage and hour surveys is fear of litigation. They do not want to be called to deposition or trial because it is an unknown process of which they are fearful. This provides no indication as to how they may respond to survey questions if they participated in the survey.

81. Another method for analyzing the potential for differences between the respondents and nonrespondents is to assess the differences in responses for individuals who were difficult to get on the phone to take the survey versus those who responded relatively quickly.[66] The individuals who were difficult to contact are more likely to be representative of the individuals who did not take the survey. A correlation analysis can be performed to assess for potential differences in number of calls influencing the survey response.


*An Example of a "Gold Standard" Validation of a Survey Response Average*

82. Another common criticism that is contained in defense expert's reports is that survey respondents will suffer from memory issues leading to inflated survey responses that will cause defendants to overpay for damages. A survey I conducted in a class action wage and hour case in 2019 directly contradicts this claim. The case is *Aldapa v. Fowler Packing*.[67] In this matter I was able to perform a "gold standard" validation because the "true recorded values" could be

---

[65] Ibid., page 670.

[66] Freedman, David, Robert Pisani, and Roger Purves, *Statistics, 4th Edition*, New York: W.W. Norton & Company, 2007, page 344.

[67] *Beatrice Aldapa et al. v. Fowler Packing Company, Inc. et al.* (case number: 1:15-CV-00420-DAD-SAB).

compared with the survey responses.[68]   The survey participants were farm workers that performed piece-rate work that involved picking fruit.  During the first four years and seven months of the class period, the class members were only paid for the actual pieces of fruit they picked but they were also required to perform pre-shift, mid-shift, and post-shift work related to their picking (hereafter "non-productive time") for which they were not compensated.  This changed in November 2015.  They still had to perform non-productive work but they began being paid for this work time and it was documented in a payroll code titled "non-productive time."  The class period ended in June 2018 so there are two years and eight months of payroll data for non-productive time.  The survey participants were asked to estimate their pre-shift, mid-shift and post-shift non-productive time during the entire class period.  The average of their estimates was 38.4 minutes.  The payroll data showed an average of 39.2 minutes.  Therefore, the survey responses were almost exactly equivalent to the actual data.[69]

### V.  Results of the Pilot Survey

83.  Davis Research randomly selected 400 individuals from the class contact list to potentially be surveyed.  Survey responses were obtained from 52 of these individuals.  The number of individuals that were contacted and refused to participate is 40.  Therefore, the cooperation rate to date is 57 percent and the response rate 14 percent.  See Exhibit C for Bill Davis' report that documents these numbers.  Mr. Davis' report states that these cooperation and response rates are "within normal and expected ranges for these types of surveys."

---

[68] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 417.
[69] This is the only wage and hour survey I have conducted where a "gold standard" validation process could be conducted.

44

84. Table 1 shows the survey responses to the employment status question. Twenty-three percent of survey respondents are currently employed by Starbucks and 77 percent are former employees. The result of this pilot survey question shows that there will be a large number of current and former employees in the full survey such that the potential for employment status bias can be assessed.[70]

---

[70] The estimated number of current and former employees in the full sample will be 127 and 423, respectively. These estimates are based on the proportions in the pilot survey.

45

**Table 1: Employment Status of the Survey Participants**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 1 | Currently employed by Starbucks? | Yes | 12 | 22.6% |
| | | No | 41 | 77.4% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |
| 1A | Job title for current employees | | | |
| | -- Manager / Assistant Manager | | 12 | 22.6% |
| | Job Title at Departure for Former Employees | | | |
| | -- Manager / Assistant Manager | | 39 | 73.6% |
| | -- General Manager | | 1 | 1.9% |
| | -- Barista | | 1 | 1.9% |
| | | | ---------- | ---------- |
| | | Total | 53 | 77.4% |
| 1B | Number of Starbucks locations as Manager / Asst Manager? | One | 6 | 11.3% |
| | | Two to Three | 25 | 47.2% |
| | | Four to Five | 13 | 24.5% |
| | | Six to Ten | 7 | 13.2% |
| | | More than Ten | 2 | 3.8% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |
| 1C | Worked 20+ shifts as Manager / Asst Manager? | Yes | 52 | 98.1% |
| | | No | 0 | 0.0% |
| | | DK / REF | 1 | 1.9% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |

46

85.  Table 2 shows the responses to the personal cell phone usage questions during work shifts. One hundred percent of survey respondents said they used their personal cell phone for their work at Starbucks.  Survey participants were also asked about the need to have their cell phone available during their work shifts.  They were read four job duties that may have necessitated the need to have their cell phone available.  These job duties and the percentage of survey respondents who agreed with the need for having their personal cell phone available are as follows:

- taking calls, texts, and e-mails from supervisors (86.5 percent),

- calling, texting and e-mailing other store managers and employees (94.2 percent),

- using Workplace by Facebook or other messaging application (71.2 percent),

- taking pictures or videos of work situations that needed to be documented (84.6 percent).

One hundred percent of survey participants agreed that at least one of these job duties necessitated having their personal cell phone available during their work shifts.

86.  Table 2 also shows the responses to the survey questions about reimbursement for using personal cell phones for Starbucks work.  Seventy-seven percent of the survey respondents stated they did not receive any reimbursements.  Nine percent of the survey respondents did not recall ever receiving any reimbursements.  Fourteen percent of respondents stated that they received some reimbursement for their personal cell phone expenses.  These respondents were asked how frequently they "requested and received" reimbursements.  Only two of the survey respondents (four percent of all survey respondents), stated they had been fully reimbursed.

47

**Table 2: Responses to Survey Questions about Cell Phone Usage for Work**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 2 | Use Personal Cell Phone for Starbucks Work? | Yes | 52 | 100.0% |
| | | No | 0 | 0.0% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 52 | 100.0% |
| 2B | Need Personal Cell Phone Available for: | | | |
| | Supervisor or other Starbucks corporate employee called, e-mailed, texted or instant messaged | Yes | 45 | 86.5% |
| | Other store employees or other store managers called, e-mailed, texted or instant messaged | Yes | 49 | 94.2% |
| | Workplace by Facebook or another group messaging application | Yes | 37 | 71.2% |
| | Pictures or videos of work situations that needed to be documented | Yes | 44 | 84.6% |
| 2B | Answered "Yes" to at Least One Question in 2B | | 52 | 100.0% |
| 2C-1 | Any reimbursement from Starbucks for personal cell phone usage at work? | Yes | 7 | 13.5% |
| | | No | 40 | 76.9% |
| | | DK / REF | 5 | 9.6% |
| | | | ---------- | ---------- |
| | | Total | 52 | 100.0% |
| 2C-2 | How frequently request and receive reimbursement? | Always | 1 | |
| | | Most of the Time | 1 | |
| | | Sometimes | 1 | |
| | | Rarely | 1 | |
| | | Never | 1 | |
| | | DK / REF | 0 | |
| | | Not Asked[1] | 2 | |
| | | | ---------- | |
| | | Total | 7 | |
| 2C-1 & 2C-2 | Stated they have been fully reimbursed for personal cell phone usage for Starbucks work | Yes | 2 | 3.8% |
| | | No[2] | 50 | 96.2% |
| | | | ---------- | ---------- |
| | | | 52 | 100.0% |

1. Pretest survey participant.  Question not asked during pretest.
2.  Includes "Don't Know" responses.

87. The survey responses to date clearly shows uniformity among the survey participants regarding usage and the need for availability of their personal cell phones during their work shifts. The fact that 52 out of 52 survey participants stated they used their personal cell phone for work, and their cell phone needed to be available during work shifts, shows that the full sample of survey responses will have little to no variation for these questions. At this stage of the survey, I cannot conclude that all of the eventual 550 survey participants will state they used their personal cell phone for work and they needed it available for their job duties. However, the number of survey participants who state they did not use their personal cell phones for work will be very small, if there are any at all. Also, the number of survey participants who state they did not need their personal cell phones to be available during their work shifts will be very small, if there are any at all. The pilot survey sample size of 52 is akin to flipping a coin 52 times and each time it comes up heads. The coin might yield a tail in the future, but it is unlikely.

88. Table 3 shows the survey responses for the off-the-clock work questions. Survey respondents were asked about various work-related communications that may have caused them to use their personal cell phones when they were off-the-clock. These work-related communications and the percentage of respondents who agreed that they performed such tasks are as follows:

- taking or making work-related phone calls (96.2 percent),

- reading, writing or responding to work-related texts (96.2 percent),

- reading, writing or responding to work-related e-mails (59.6 percent),

- reading, writing or responding to work-related posts in Workplace by Facebook or another group messaging application (55.8 percent),

- taking work-related photos or videos (38.5 percent).

49

All of the pilot survey participants, except one (98.1 percent), stated they performed at least one of these off-the-clock work-related communications.

**Table 3: Responses to Survey Questions about Off-the-Clock Work**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 3 | Perform the following off-the-clock? | | | |
| | Taking work-related phone calls or making work-related phone calls | Yes | 50 | 96.2% |
| | Reading, writing or responding to work-related text or instant messages | Yes | 50 | 96.2% |
| | Reading, writing or responding to work-related e-mails | Yes | 31 | 59.6% |
| | Reading, writing or responding to work-related posts in Workplace by Facebook or another group messaging app | Yes | 29 | 55.8% |
| | Taking a work-related photo or video | Yes | 20 | 38.5% |
| 3 | Answered "Yes" to at Least One Question in 3 | | 51 | 98.1% |
| 3B | District manager or any other supervisor instruct to not perform off-the-clock work? | Yes | 33 | 64.7% |
| | | No | 15 | 29.4% |
| | | DK / REF | 3 | 5.9% |
| | | Total | 51 | 100.0% |
| 3C | Ever have to work off-the-clock due to District manager or any other supervisor calling, texting or e-mailing you? | Yes | 40 | 78.4% |
| | | No | 10 | 19.6% |
| | | DK / REF | 1 | 2.0% |
| | | Total | 51 | 100.0% |
| 3D | How frequently contacted by District manager or other supervisor while off-the-clock? | Very Frequently | 12 | 30.0% |
| | | Frequently | 14 | 35.0% |
| | | Occassionally | 11 | 27.5% |
| | | Rarely | 3 | 7.5% |
| | | Never | 0 | 0.0% |
| | | DK / REF | 0 | 0.0% |
| | | Total | 40 | 100.0% |
| 3E | Amount of time spent per week on off-the-clock work | Hours Per Week | 3.5 | |
| | | Responses with Estimates | 46 | 88.5% |
| | | Don't Know Responses | 6 | 11.5% |
| | | | 52 | 100.0% |

89. Table 3 also shows the results of questions about survey respondents' work-related communications with District Managers, and other supervisors, while the respondents were off-the-clock work. The first question was about a District Manager or other supervisor's instruction not to perform off-the-clock work. Sixty-five percent of survey participants said they had received this instruction. The next question asked about whether the District Manager or other supervisor could have potentially known off-the-clock work was being performed. The question asked whether a District Manager or other supervisor was sending work-related communications that caused off-the-clock work to be performed. Seventy-eight percent of survey participants said this occurred. These survey participants were subsequently asked how frequently the communications occurred. Sixty-five percent of survey participants stated the off-the-clock work-related communications from a District Manager or other supervisor occurred "very frequently" or "frequently."

90. Survey participants were asked about the duration of off-the-clock work related to cell phone communications. The average response to the duration question was 3.5 hours per week (see Table 3).

91. Table 4 shows the results of survey questions regarding interrupted meal breaks. Seventy-five percent of survey respondents stated that they responded to work-related communications during their meal breaks. Survey respondents who said they were interrupted were then asked to estimate the percentage of breaks that were interrupted by work-related communications. The average number of interrupted breaks was 23.2 percent. These survey respondents were then asked if they were expected to respond to the communications during the breaks or if it could have waited. Individuals that stated the expectation to respond varied, were asked to estimate the percentage of breaks where it was expected for them to respond to the communications during

52

the breaks.  After accounting for communications that could have waited until after the break was over, the average percentage of interrupted meal breaks was 14.6 percent.  This statistic shows the percentage of breaks that a meal period premium may be due since the survey participants were not relieved of all of their work duties.  Currently, the sample size is too small to make any class-wide projections regarding unpaid meal period premiums.  After the full survey of 550 survey responses is obtained, the margin of error will be approximately three percent and it will likely be a valid and reliable statistic for projecting class-wide meal period premium wage damages.[71]  Only two of the survey participants were not able to estimate their interrupted meal periods such that a damages amount could be calculated.  The response rate of 96.1 percent shows that the question is not too difficult for the survey respondents to answer.

---

[71] The analysis of whether the results of this survey question potentially has response or non-response bias will be conducted after the full sample of 550 survey responses is obtained.

**Table 4: Responses to Survey Questions about Cell Phone Usage During Meal Breaks**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 4 | Ever respond to work-related communications on cell phone during meal breaks? | Yes | 39 | 75.0% |
| | | No | 13 | 25.0% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 52 | 100.0% |
| 4A | Percentage of meal breaks responding to work-related communications? | Percent of Breaks | 23.2% | |
| 4B | Expectations regarding responding to work-related communications during meal breaks | Expected to respond during break | 7 | 18.4% |
| | | Could have waited until after break | 5 | 13.2% |
| | | It varied | 26 | 68.4% |
| | | | ---------- | ---------- |
| | | Total | 38 | 100.0% |
| 4C | Percentage of breaks when contacted expected to respond | Percent of Breaks | 47.3% | |
| 4A, 4B, & 4C | Percent of meal breaks with work-related communications and expected to respond | Percent of Breaks | 14.6% | |

92. The same set of questions that were asked to the survey participants about meal periods were asked regarding rest periods. The results of the survey questions are shown in Table 5. After accounting for communications that could have waited until after the break was over, the average percentage of interrupted rest breaks was 22.3 percent. Currently, the sample size is too small to make any class-wide projections regarding unpaid rest period premium wages. After the full survey of 550 survey responses is obtained, the margin of error will be approximately three percent and it will likely be a valid and reliable statistic for projecting class-wide rest period

54

premium wage damages.  Four survey participants were not able to estimate the number of their interrupted breaks.  This response rate of 92.3 percent shows that the question is not too difficult for the survey respondents to answer.

**Table 5: Responses to Survey Questions about Cell Phone Usage During Rest Breaks**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 5 | Ever respond to work-related communications on cell phone during rest breaks? | Yes | 35 | 67.3% |
| | | No | 14 | 26.9% |
| | | DK / REF | 3 | 5.8% |
| | | | ---------- | ---------- |
| | | Total | 52 | 100.0% |
| 5A | Percentage of rest breaks responding to work-related communications? | Percent of Breaks | 33.4% | |
| 5B | Expectations regarding responding to work-related communications during rest breaks | Expected to respond during break | 12 | 34.3% |
| | | Could have waited until after break | 3 | 8.6% |
| | | It varied | 20 | 57.1% |
| | | | ---------- | ---------- |
| | | Total | 35 | 100.0% |
| 5C | Percentage of breaks when contacted expected to respond | Percent of Breaks | 59.3% | |
| 5A, 5B, & 5C | Percent of rest breaks with work-related communications and expected to respond | Percent of Breaks | 22.3% | |

93.  Table 6 shows the survey participants' level of certainty about their answers, level of education, age, gender and knowledge of the lawsuit.  Forty-three percent of survey respondents knew about a lawsuit involving Starbucks prior to taking the survey.  The percentage of survey

55

participants that knew the lawsuit involved cell phones is 34 percent.  The final sample size of 550 survey respondents will yield two large groups of individuals that did, and did not, know about the lawsuit.  These two groups can be compared through a statistical analysis that will show if knowledge of the lawsuit potentially biased the survey responses.

**Table 6: Summary of Survey Question Used for Statistical Purposes**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 6 | Certainty of survey responses. | Not Sure at All | 0 | 0.0% |
| | | Slightly Sure | 0 | 0.0% |
| | | Moderately Sure | 4 | 7.5% |
| | | Very Sure | 23 | 43.4% |
| | | Completely Sure | 26 | 49.1% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | | 53 | 100.0% |
| 7 | Level of education | Less Than High School | 0 | 0.0% |
| | | GED | 0 | 0.0% |
| | | High School | 5 | 9.4% |
| | | Vocational Degree | 1 | 1.9% |
| | | Some College | 23 | 43.4% |
| | | College Degree | 21 | 39.6% |
| | | Graduate Degree | 2 | 3.8% |
| | | REF | 1 | 1.9% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |
| 8 | Age | Average | 36 | |
| | | Youngest | 25 | |
| | | Oldest | 57 | |
| 9 | Gender | Male | 23 | 43.4% |
| | | Female | 30 | 56.6% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | | 53 | 100.0% |
| 10 | Know anything about a lawsuit involving Starbucks prior to taking survey? | Yes | 23 | 43.4% |
| | | No | 30 | 56.6% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |
| 11 | Know any specifics about lawsuit in this matter? | Yes | 18 | 34.0% |
| | | No | 35 | 66.0% |
| | | | ---------- | ---------- |
| | | Total | 53 | 100.0% |

## VI. Conclusion

94. In summary, the 52 pilot survey responses are conclusive regarding class member usage of personal cell phones for Starbucks work and the need to have personal cell phones available for job duties during their work shifts. Nearly all, or all, of the class members used their personal cell phones for Starbucks work and needed to have their personal cell phone available for their job duties during their work shifts. The pilot survey responses also conclusively show that a significant majority of class members have not been fully reimbursed for using their personal cell phones for Starbucks work.

95. The pilot survey responses show that the survey participants are able to provide estimates of the issues in question with a very high response rate that will assist the trier-of-fact in determining damages in this matter. The reimbursement for cell phone expenditures had a response rate of 100 percent of the survey participants answering the questions. The amount of off-the-clock work time questions had an 88.5 percent response rate. The questions on the percentage of meal and rest breaks that were interrupted by work-related communications had response rates of 96 percent and 92 percent, respectively. The importance of these response rates is that they show these survey questions are not difficult for the respondents to answer. Therefore, the survey responses to these questions will likely be valid and reliable estimates for determining damages. The validity and reliability of the survey responses will be determined by the statistical analysis of response bias and nonresponse bias after the full sample of 550 responses is obtained.

96. The pilot survey was conducted using generally accepted scientific principles established by the relevant scientific community of survey experts and statisticians. The validity and reliability of the survey data is determined by the survey method, the survey questionnaire and the analysis

58

of the survey data.  Based on my analysis of the pilot survey data and my considerable experience in designing surveys and analyzing survey data in class action wage and hour cases, it is my conclusion that the full survey of 550 survey responses will likely yield valid and reliable data for determining damages.  The survey responses can also be used as part of the determination of liability.

97.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 20, 2022 at Oakland, California.


_____

Jeffrey S. Petersen, Ph.D.

59

# EXHIBIT A

# JEFFREY S. PETERSEN

Allman & Petersen Economics, LLC                        Phone: (510) 382-1550
7677 Oakport Street, Suite 610                             FAX: (510) 382-1472
Oakland, CA 94621                          E-mail: jeff@allmaneconomics.com

## EMPLOYMENT HISTORY

2003 – present    ***Partner***
                  Allman & Petersen Economics, LLC
                  Oakland, California

2014 – present    ***Adjunct Associate Professor of Economics***
1999 – 2001       St. Mary's College
                  Moraga, CA

1998 – 2003       ***Senior Economist***
                  U.S. Government Accountability Office (formerly the General Accounting Office)
                  San Francisco, California

1999 – 2001       ***Economics Instructor***
                  Golden Gate University
                  San Francisco, California

1995 – 1998       ***Postdoctoral Fellow***
                  University of California, Berkeley

1990 – 1995       ***Research and Teaching Assistant***
                  University of Utah
                  Salt Lake City, Utah

## EDUCATION

1996              Postdoctoral Training Program in Health Economics
                  University of California, Berkeley

1995              Ph.D. in Economics, University of Utah

1989              B.A. in Economics, San Jose State University

## PUBLICATIONS

***Peer-Reviewed Book***

> *"Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003 (co-authored with David Levine, Frank Neuhauser, Richard Reuben, and Christian Etcheverria).

*Peer-Reviewed Journal Articles*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019 (co-authored with Phillip Allman).

"The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017 (co-authored with Phillip Allman).

"Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015 (co-authored with Phillip Allman and William Lee).

"Carve-Outs from the Workers Compensation System," *Journal of Policy Analysis and Management*, 2002, Volume 21, No. 3, (co-authored with David Levine and Frank Neuhauser).

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws," *Industrial Relations*, 2000, Volume 39, No. 2.

"A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3, (co-authored with Craig Zwerling).

*Other Publications*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," proceedings of the 2019 Allied Social Sciences Association, National Association of Forensic Economics Section (co-authored with Phillip Allman).

"International Responses to an Aging Labor Force," *Work Options for Mature Americans*. Teresa Ghilarducci and John Turner eds., Notre Dame, Indiana: University of Notre Dame Press, 2005. (co-authored with Charles Jeszeck, Anthony Defrank, Katherine Leavitt, Janice Peterson, Yunsian Tai, and Howard Wial).

"Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers," in *The Economics of Prevailing Wage Laws,* Peter Philips and Hamid Azari eds., Ashgate Publishing, 2005. (co-authored with Erin Godtland).

"Private and Public Sector Employment Policies to Extend the Labor Force Participation of Older Workers," *Proceedings of the 55th Annual Industrial Relations Research Association Annual Conference, 2003.*

"Return to Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,* 1999, (co-authored with Lara Papadakis, Diane Morabito, Herb Ochitill, Alicia Bocellari, and Robert Mackersie).

*Portable Pensions for Casual Labor Markets: Lessons from the Operating Engineers Central Pension Fund*, Quorum Books, Westport, CT, 1996 (co-authored with Teresa Ghilarducci, Garth Mangum, and Peter Philips).

***Selected General Accounting Office Reports***

"Older Workers: Policies of Other Nations to Increase Labor Force Participation," GAO-03-307, Feb. 2003

"Older Workers: Demographic Changes Pose Challenges for Employers and Workers," GAO-01-85, Nov. 2001

"Characteristics of Persons in Labor Force Without Pension Coverage," GAO/HEHS-00-131, Aug. 2000

"Social Security Reform: Implications of Raising the Retirement Age," GAO/HEHS-99-112, Aug. 1999

## REVIEWER FOR PEER-REVIEWED JOURNALS AND BOOKS

Industrial Relations (University of California, Berkeley)

Perspectives (peer-reviewed section of the Social Security Bulletin)

Journal of Legal Economics

Palgrave Macmillan, Economics & Business Publications

The Earnings Analyst

## PRESENTATIONS

"Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing, Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

"Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, July 2022.

"Wage and Hour Surveys: Assisting with the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Meeting of the American Academy of Economic and Financial Experts, April 2021.

"Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

"The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

"Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

"The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

"Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

"Surveys in Class Action Wage and Hour Cases," CLE Seminar, San Francisco, CA, October 2018.

"Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

"Working to Age 70 or Older – How Much Does Intention Matter?  Evidence from the Health and Retirement Study," 28th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, March 2016.

"Policies to Extend the Labor Force Participation of Older Workers" – Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Washington, DC, Jan. 2003.

Discussant for the panel "The Population Age 50-70 -- Past Trends and Future Projections" at the National Academy of Social Insurance conference on the Implications of an Aging Workforce for Income Security and Employee Benefits, Washington, D.C., Nov. 2001

"Raising the Eligibility Ages for Social Security Benefits: Work and Health Issues Associated with this Policy Change" - School of Public Policy, University of California, Los Angeles, Jan. 2001

"The Labor Market for Older Workers" - Bay Area Labor Economists Fall Workshop, Public Policy Institute of California, San Francisco, CA, Nov. 2000

"Raising the Eligibility Ages for Social Security Benefits: An Analysis of the Policy Implications" - Association for Public Policy Analysis and Management Annual Research Conference, New York, NY, Oct. 1998.

"Carving Out Construction Employees from the Workers Compensation System in California: Putting Theory into Practice"
- Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Chicago, IL, Jan. 1998
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Return to Work Following Acute Traumatic Injury"
- American Association for the Surgery of Trauma Annual Meeting, Boston, MA Sept. 1999
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

*Jeffrey S. Petersen, page 4 of 5*

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws"
- Health Economics Research Organization Section of the Allied Social Sciences Association Annual Meetings, New Orleans, LA, Jan. 1997

"Retirement from the Construction Industry" – University of California, Berkeley, Department of Demography, May 1995.

## HONORS

| | |
|---|---|
| Vice President, American Academy of Economic and Financial Experts | 2022-present |
| Member of the Board of Directors, American Academy of Economic and Financial Experts | 2017-2020 |
| National Research Service Award, Public Health Postdoctoral Fellowship, U.S. Department of Health and Human Services | 1995-1997 |
| Outstanding Scholar Athlete Honor Roll, San Jose State University | 1988-1989 |
| NCAA Division I Tennis Team, San Jose State University | 1987-1989 |

## PROFESSIONAL ORGANIZATIONS

American Economic Association

National Association of Forensic Economics

American Academy of Economic and Financial Experts

American Association for Public Opinion Research

Western Economic Association International

*Jeffrey S. Petersen, page 5 of 5*

# ALLMAN & PETERSEN ECONOMICS, LLC

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max Allman, MA, CFA

7677 Oakport Street, Suite 610 • Oakland, CA 94621
TEL (510) 382-1550  FAX (510) 382-1472

### FEE SCHEDULE (1/5/22)

(1)  Economic research and analysis, report preparation, document review, office and client consultations, deposition preparation and trial preparation.[1]

| | |
|---|---|
| -- Ph.D. Economist | $600 / hour |
| -- Senior Economist | $425 / hour |
| -- Economist or CPA | $275 / hour |
| -- Survey Administration | $125 / hour |

(2)  Deposition testimony[2]                                    $750 / hour

(3)  Arbitration and trial testimony[3]                          $750 / hour

(4)  Travel time                                                $250 / hour

---

[1] Bills will be submitted periodically and are due upon presentation, not at the conclusion of the case.

[2] Payment for deposition testimony shall be paid in accordance with C.C.P. '2034 (i) (3) --i.e. payment of an expert's fees for the anticipated length of a deposition shall be paid at the commencement of his/her deposition, and any outstanding balance shall be paid within five days of receiving an itemized statement of the expert's services.

[3] All invoices to date must be paid prior to trial testimony.  In addition, an additional retainer must be paid prior to the trial testimony based upon the estimated invoice for the testimony.

**Trial & Deposition List for Jeffrey S. Petersen (Last Four Years)**

| | Case | Case Number | Jurisdiction | Date |
|---|---|---|---|---|
| **Trials & Arbitrations** | Yumul et al. v. Indus Investments et al. | BC565881 | Los Angeles | April, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | September, 2019 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | September, 2021 |
| | Chavez, et al. v. California Collision | RG17865765 | Alameda | August, 2022 |
| | | | | |
| **Depositions** | Pineda et al. v. Lithographix | BC612372 | Los Angeles | January, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | June, 2019 |
| | Dueker et al. v. CRST Expedited | 2:18-cv-08751-FMO-FFM | Central District of California | September, 2019 |
| | Nevarez et al. v. Costco Wholesale Corp. | 2:19-cv-03454-SVW-SKx | Northern District of California | January, 2020 |
| | Sephora Wage and Hour Cases | CGC-16-550894 | San Francisco | June, 2020 |
| | Dhawan v. Regents of the Univ. of CA | RG18911598 | Alameda | October, 2020 |
| | Van Bebber v. Dignity Health | 1:19-cv-00264-DAD-EPG | Eastern District of California | October, 2020 |
| | Ayala v. UPS Supply Chain Solutions | 5:20-cv-00117-PSG-AFM | Central District of California | February, 2021 |
| | Christensen v. Carter's Retail | 8:20-cv-00776 JLS (KESx) | Central District of California | April, 2021 |
| | Nucci v. Rite Aid | 19-CV-01434-LHK | Northern District of California | June, 2021 |
| | Crump v. Hyatt | 4:20-cv-00295-HSG | Northern District of California | June, 2021 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | August, 2021 |
| | Williams v. Saint Joseph's | 30-2020-01134268-CU-OE-CXC | Orange | September, 2021 |
| | Johnson v. Bakersfield Memorial | BCV-19-102016 | Kern | October, 2021 |
| | Powell v. Saint Joseph's | STK-CV-UOE2019-0011155 | San Joaquin | October, 2021 |
| | Castillo v. Western Range | 3:16-cv-00237-RJC-VPC | District of Nevada | November, 2021 |
| | Cruz v. Bruceville Terrace | 34-2018-00245506 | Sacramento | November, 2021 |
| | Larson v. Mark Twain Medical Center | 19CV44062 | Calaveras | November, 2021 |
| | Aldapa v. Fowler Packing | 1:15-CV-00420-DAD-SAB | Eastern District of California | December, 2021 |
| | Vasquez v. Leprino Foods | 1:17-cv-00796-AWI−BAM | Eastern District of California | January, 2022 |
| | Hinds v. Fedex Ground | 3:18-cv-01431-JSW (EDL) | Northern District of California | March, 2022 |
| | Rodriguez v. Walmart | 2:20-cv-07045 AB(KKx) | Central District of California | May, 2022 |
| | Sanchez v. Sam's West, Inc. | 2:21-cv-05122-SVW-JC | Central District of California | May, 2022 |
| | Cruz v. Talentscale | RIC1821842 | Riverside | May, 2022 |
| | Villanueva v. Select Employment Services | 3:17-cv-06875-JCS | Northern District of California | September, 2022 |
| | Perez v. Leprino Foods | 1:17-cv-00686-AWI-BAM | Eastern District of California | October, 2022 |
| | Stafford v. Bojangles Restaurants | 3:20-cv-266-MOC | Western District of North Carolina | October, 2022 |
| | Dieves v. Butte Sand Trucking | CVCS19-0001082 | Sutter | November, 2022 |

# EXHIBIT B

**PILOT SURVEY INSTRUMENT**

Respondent Name: _____

Hello, may I please speak with [RESPONDENT NAME]? I am not selling anything.

>   **IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Who's Calling":**
>
>   This is _____, I am with Davis Research calling to speak with [RESPONDENT FIRST NAME] about his/her work at Starbucks and we are offering $10 for completing a 10 minute survey.
>
>   **IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Why are you calling? / Can you tell me what you are calling about?":**
>
>   We have been asked to conduct a survey by the lawyers who seek to represent a class of current and former Starbucks managers in a pending lawsuit.
>
>   **IF THERE IS NO ANSWER, LEAVE THE FOLLOWING VOICE MAIL:**
>
>   Hello, I am _____ calling from Davis Research and I am not trying to sell you anything. I am calling to conduct a survey about employment issues at Starbucks at the request of lawyers who represent a class of current and former Starbucks managers in a pending lawsuit.  Please return my phone call at _____ so I can administer the survey to you. This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

**ONCE RESPONDENT IS ON THE PHONE:**

Hello, I am _____ calling from Davis Research.  I am calling to conduct a survey about employment issues at Starbucks at the request of lawyers who seek to represent a class of current and former Starbucks store managers and assistant store managers in a pending lawsuit.  This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

[DISPO HERE – 99 TO CONTINUE]

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by Starbucks attorneys about your answers.  Therefore, take your time when responding to the questions.  Even if you're not completely sure of the exact answer to a question, please give me your best estimate.  If you don't know the answer to a question, it is also okay to answer "I don't know." We simply need survey answers that are as accurate and honest as possible.

**READ ONLY IF NEEDED:** You will be represented free of charge by the lawyers for the employees if Starbucks wishes to ask you about your survey answers.  This is not likely since

1

there will be hundreds of individuals completing the survey.  It is illegal for Starbucks to take action against you for participating in this survey.
**READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:**  Your anonymity cannot be guaranteed.  It is illegal for Starbucks to take action against you for participating in this survey.

**NOTE TO PROGRAMMER:** If respondent refuses to participate in the survey, please read the following:

01 CONTINUE INTO SURVEY
99 REFUSED

[IF 99 HERE OR REFUSED OR DNC IN INTRODUCTION OR IF MID-TERM AFTER Q1 READ. DON'T ALLOW MID-TERM UNTIL AFTER Q1]

[REFUSAL_REASON]

It is very important to understand why you are not willing to take the survey.  Can you please tell me your reason?

**CODE RESPONSE VERBATIM**

---

[READ]

[INTERVIEWER: Did you read either of these two optional items during the introduction?]

   (A) **READ ONLY IF NEEDED:** You will be represented free of charge by the lawyers for the employees if Starbucks wishes to ask you about your survey answers.  This is not likely since there will be many individuals completing the survey.  It is illegal for Starbucks to take action against you for participating in this survey.

   (B) **READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:**  Your anonymity cannot be guaranteed.  It is illegal for Starbucks to take action against you for participating in this survey.

01 Yes, I read both of those.
02 Yes, but read A only
03 Yes, but read B only
04 No

1.      Are you currently employed by Starbucks?

   1.  Yes
   2.  No

   99.  (DO NOT READ) Refused [END INTERVIEW]


1A.     [if Q1 = 1]  What is your job title at Starbucks? [capture verbatim]
        [if Q1 = 2]  What was your job title when you stopped working at Starbucks? [capture verbatim]

   98.  (DO NOT READ) Don't know
   99.  (DO NOT READ) Refused


1B.     How many different Starbucks locations in California did you work at in the position of store manager or assistant store manager?

   CODE NUMBER

   98.  (DO NOT READ) Don't know
   99.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q1B = 0; GO TO CONCLUDING STATEMENT


1C.     [if Q1 = 1]  Have you worked twenty shifts or more as a store manager or assistant store manager?

        [if Q1 = 2]  Did you work twenty shifts or more as a store manager or assistant store manager?

   1.  Yes
   2.  No

   98.  (DO NOT READ) Don't know
   99.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q1C = 2, 98, OR 99; GO TO CONCLUDING STATEMENT

My next questions are about your employment as a store manager or assistant store manager at Starbucks locations in California during the period of June 2015 to the present. Any other time period you worked for Starbucks should be disregarded when answering the questions. If you worked at multiple Starbucks locations in California as a store manager or assistant store manager during this time period please answer the questions based on your average experience at the stores. As a final reminder these questions are only in regards to your employment as a store manager or assistant store manager. If you held any other job titles at Starbucks, ignore those when answering the questions.

2.      Did you use your personal cell phone for any of your work at Starbucks?

   1. Yes
   2. No

   98. (DO NOT READ) Don't Know
   99. (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q2 = 2, 98 OR 99, SKIP TO Q6

2B.     I am going to read you several situations that may have required you to have your personal cell phone available during your work shifts. After I read each statement, please answer yes or no with a "yes" meaning you needed to have your personal cell phone available and a no meaning you did not. [**NOTE TO PROGRAMMER:** Yes = 1, No = 2, Don't Know = 98, Refused = 99]

   1. My supervisor or other Starbucks corporate employee called, e-mailed, texted or instant messaged me on my personal cell phone

   2. Other store employees or other store managers called, e-mailed, texted or instant messaged me on my personal cell phone

   3. I used Workplace by Facebook or another group messaging application on my personal cell phone

   4. I took pictures or videos on my personal cell phone of work situations that needed to be documented

4

2C-1. Since you said you used your personal cell phone for your work at Starbucks, did Starbucks ever reimburse you for any of your personal cell phone expenses?

1. Yes
2. No

98. (DO NOT READ) Don't Know
99. (DO NOT READ) Refused

**SKIP LOGIC:**
- IF Q2C = 2, 98, OR 99; SKIP TO Q3 INTRO

2C-2. How frequently did you request and receive reimbursement for your personal cell phone expenses related to your work at Starbucks?

1. Always
2. Most of the time
3. Sometimes
4. Rarely
5. Never

98. (DO NOT READ) Don't Know
99. (DO NOT READ) Refused

[Q3 INTRO]  My next questions are about using your cell phone outside the time of your scheduled shifts when you were clocked out from work.  I will refer to this time as "off-the-clock."  This does not include the time you were clocked out for meal breaks.  I will ask you about your time on meal breaks in a separate section.  Some of the questions will ask you to provide an estimate.  You may estimate in your survey responses but please do not guess.

3.      Did you ever perform the following work-related activities off-the-clock?  Please answer yes or no to each …

1. Taking work-related phone calls or making work-related phone calls.
2. Reading, writing or responding to work-related text or instant messages.
3. Reading, writing or responding to work-related e-mails.
4. Reading, writing or responding to work-related posts in Workplace by Facebook or another group messaging application.
5. Taking a work-related photo or video.

[**NOTE TO PROGRAMMER:** Yes = 1, No = 2, Don't know = 98, Refused = 99]

**SKIP LOGIC:**
- If Q3 = 2, 98 OR 99 FOR ALL RESPONSES, SKIP TO Q4 INTRO

3B.     Did your district manager or any other supervisor ever instruct you to NOT perform off-the-clock work?

1. Yes
2. No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

3C.     Did you ever have to work off-the-clock as a result of your district manager or any other supervisor calling, texting or instant messaging you on your cell phone while you were off-the-clock?

1. Yes
2. No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**

6

- If Q3C = 2, 98 OR 99, SKIP TO Q3E


3D.  How frequently did you have to work off-the-clock as a result of your district manager or any other supervisor calling, texting or instant messaging you on your cell phone when you were off-the-clock?  Would you say … [READ LIST]

1.  Very Frequently
2.  Frequently
3.  Occasionally
4.  Rarely
5.  Never

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused


3E.  During a typical work week, how much time would you spend responding to work-related communications on your personal cell phone when you were off-the-clock?

[CODE RESPONSE IN HOURS, MINUTES AND/OR SECONDS]

[ALLOW FOR RANGE AND CODE BOTTOM AND TOP 3E-1 AND 3E-2, RESPECTIVELY]

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

[Q4 INTRO]  My next questions are about using your personal cell phone during meal breaks. Meal breaks are 30-minute time periods of your workday when you clock out and are not being paid for this time.

4.      Did you ever respond to work-related communications on your personal cell phone during your meal breaks?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4 = 2, 98 OR 99, SKIP TO Q5 INTRO

4A.     How frequently did you respond to work-related communications on your personal cell phone during your meal breaks?  Please estimate as a percentage of your meal breaks.

[**NOTE TO PROGRAMMER:** If Q4A = 01, enter percentage in variable 4A-1.  If Q4A = 02, enter start of range in 4A-1 and second number in 4A-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4A = 998 OR 999, SKIP TO Q5 INTRO
- If Q4A-1 = 0% AND Q4A IS 01, SKIP TO Q5 INTRO

8

4B.    Which of the following statements best describes how you responded to work-related communications on your personal cell phone during your meal breaks?

1.  It was expected as part of my job duties to respond to work-related communications on my personal cell phone during meal breaks.

2.  I could have waited until my meal break was over to respond to work-related communications on my personal cell phone.

3.  It varied.  I was expected to respond to some work-related communications on my personal cell phone during my breaks and some of my work-related communications I could have waited until after my meal break was over.

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4B = 1, 2, 98 OR 99, SKIP TO Q5 INTRO

Since you told me it varied, I want to find out how often you needed to respond during your break and how often it could have waited.  I will ask this as a percentage of your meal breaks when you received communications on your personal cell phone.

4C.    What percentage of your meal breaks were you expected to respond to the work-related communications during your break?

[**NOTE TO PROGRAMMER:** If Q4E = 01, enter percentage in variable 4C-1.  If Q4C = 02, enter start of range in 4C-1 and second number in 4C-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

98.  (DO NOT READ) Don't know
99.  (DO NOT READ) Refused

9

[Q5 INTRO]  My next questions are about rest breaks.  You do not clock out for rest breaks.  They are a ten minute break time when you stay on the clock.

5.      Did you ever respond to work-related communications on your personal cell phone during your rest breaks?

    1.  Yes
    2.  No

    98.  (DO NOT READ) Don't Know
    99.  (DO NOT READ) Refused

    **SKIP LOGIC:**
    •   If Q5 = 2, 98 OR 99, SKIP TO Q6

5A.     How frequently did you respond to work-related communications on your personal cell phone during your rest breaks?  Please estimate as a percentage of your rest breaks.

    [**NOTE TO PROGRAMMER:** If Q5A = 01, enter percentage in variable 5A-1.  If Q5A = 02, enter start of range in 5A-1 and second number in 5A-2]

    01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
    02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

    998.  (DO NOT READ) Don't know
    999.  (DO NOT READ) Refused

    **SKIP LOGIC:**
    •   If Q5A = 998 OR 999, SKIP TO Q6
    •   If Q5A-1 = 0% AND Q5A IS 01, SKIP TO Q6

5B.     Which of the following statements best describes how you how felt about responding to work-related requests during your rest breaks?

    1.  It was a necessary part of my job duties to respond immediately to work-related communications on my personal cell phone during rest breaks.

    2.  I could have waited until my rest break was over to respond to work-related communications on my personal cell phone.

    3.  It varied, some work-related communications on my personal cell phone needed to be responded to immediately and some could have waited until I was done with my rest break.

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q5B = 1, 2, 98 OR 99, SKIP TO Q5

5C.   What percentage of your rest breaks were you expected to respond to the work-related communications during your break?

[**NOTE TO PROGRAMMER:** If Q5C = 01, enter percentage in variable 5C-1.  If Q5C = 02, enter start of range in 5C-1 and second number in 5C-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

98.  (DO NOT READ) Don't know
99.  (DO NOT READ) Refused

11

We are almost finished, I just have a few concluding questions that will be used for statistical purposes.

6.  Please think about all the work experiences you have described for me during this survey. How sure are you that the answers you gave me accurately describe your work experiences at Starbucks?  Would you say…

    1.  Not sure at all
    2.  Slightly sure
    3.  Moderately sure
    4.  Very sure
    5.  Completely sure

    98.  (DO NOT READ) Don't know
    99.  (DO NOT READ) Refused

7.  What is the highest level of education you have completed? [DO NOT READ CHOICES]

    1. Less than High School.
    2. GED
    3. High School Diploma
    4. Vocational Degree
    5. Some College
    6. College Degree
    7. Graduate Degree
    8. Other (Specify)

    99.  (DO NOT READ) Refused

8.  What is your age?

    ENTER AGE

    99.  (DO NOT READ) Refused

9.  What is your gender?

    1.  Male
    2.  Female
    3.  Nonbinary
    4.  Other

    99.  (DO NOT READ) Refused

12

10.  Prior to my call today, did you know anything about a lawsuit involving Starbucks?

   1.  YES

   2.  NO

   98.  (DO NOT READ) Don't know
   99.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q10 = 2, 98 OR 99, SKIP TO CONCLUDING STATEMENT

11.  Please tell me, in as much detail as you can, everything you can remember about the purpose of any lawsuit involving Starbucks.  I am going to type your answer as you speak it, so it would help me if you speak slowly while I type.  Please don't tell me how you learned what you know or who told you – just tell me what you know about the purpose of any lawsuit involving Starbucks.

   TYPE OPEN-ENDED ANSWER

   **[PROBE REPEATEDLY "WHAT ELSE DO YOU REMEMBER ABOUT THE PURPOSE OF ANY LAWSUIT REGARDING STARBUCKS?" UNTIL THE RESPONDENT SAYS "NOTHING"]**

**CONCLUDING STATEMENT:** That's all the questions I have for you. Thank you very much for your help. Would you like me to send you $10 via Amazon gift card?

Amazon
DO NOT READ, Prefers check

EMAIL
It will arrive in about 7 days. What email address would you like it sent to?
CAPTURE AND CONFIRM EMAIL.

Mailing (IF CHECK SELECTED AT CONCLUDING STATEMENT)

What is your mailing address:

Street
City, State Zip

13

PRETEST SURVEY INSTRUMENT

Respondent Name: _____

Hello, may I please speak with [RESPONDENT NAME]? I am not selling anything.

**IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Who's Calling":**

This is _____, I am with Davis Research calling to speak with [RESPONDENT FIRST NAME] about his/her work at Starbucks and we are offering $10 for completing a 10 minute survey.

**IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Why are you calling? / Can you tell me what you are calling about?":**

We have been asked to conduct a survey by the lawyers who seek to represent a class of current and former Starbucks managers in a pending lawsuit.

**IF THERE IS NO ANSWER, LEAVE THE FOLLOWING VOICE MAIL:**

Hello, I am _____ calling from Davis Research and I am not trying to sell you anything. I am calling to conduct a survey about employment issues at Starbucks at the request of lawyers who represent a class of current and former Starbucks managers in a pending lawsuit.  Please return my phone call at _____ so I can administer the survey to you. This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

**ONCE RESPONDENT IS ON THE PHONE:**

Hello, I am _____ calling from Davis Research.  I am calling to conduct a survey about employment issues at Starbucks at the request of lawyers who seek to represent a class of current and former Starbucks store managers and assistant store managers in a pending lawsuit.  This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

[DISPO HERE – 99 TO CONTINUE]

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by Starbucks attorneys about your answers.  Therefore, take your time when responding to the questions. Even if you're not completely sure of the exact answer to a question, please give me your best estimate.  If you don't know the answer to a question, it is also okay to answer "I don't know." We simply need survey answers that are as accurate and honest as possible.

**READ ONLY IF NEEDED:** You will be represented free of charge by the lawyers for the employees if Starbucks wishes to ask you about your survey answers.  This is not likely since

there will be hundreds of individuals completing the survey.  It is illegal for Starbucks to take action against you for participating in this survey.

**READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:**  Your anonymity cannot be guaranteed.  It is illegal for Starbucks to take action against you for participating in this survey.

**NOTE TO PROGRAMMER:** If respondent refuses to participate in the survey, please read the following:

01 CONTINUE INTO SURVEY
99 REFUSED

[IF 99 HERE OR REFUSED OR DNC IN INTRODUCTION OR IF MID-TERM AFTER Q1 READ. DON'T ALLOW MID-TERM UNTIL AFTER Q1]

[REFUSAL_REASON]

It is very important to understand why you are not willing to take the survey.  Can you please tell me your reason?

**CODE RESPONSE VERBATIM**

---

[READ]

[INTERVIEWER: Did you read either of these two optional items during the introduction?]

(A) **READ ONLY IF NEEDED:** You will be represented free of charge by the lawyers for the employees if Starbucks wishes to ask you about your survey answers.  This is not likely since there will be many individuals completing the survey.  It is illegal for Starbucks to take action against you for participating in this survey.

(B) **READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:**  Your anonymity cannot be guaranteed.  It is illegal for Starbucks to take action against you for participating in this survey.

01 Yes, I read both of those.
02 Yes, but read A only
03 Yes, but read B only
04 No

2

1.      Are you currently employed by Starbucks?

    1.  Yes
    2.  No

    99.  (DO NOT READ) Refused [END INTERVIEW]

1A.    [if Q1 = 1]  What is your job title at Starbucks? [capture verbatim]
    [if Q1 = 2]  What was your job title when you stopped working at Starbucks? [capture verbatim]

    98.  (DO NOT READ) Don't know
    99.  (DO NOT READ) Refused

1B.    How many different Starbucks locations in California did you work at in the position of store manager or assistant store manager?

    CODE NUMBER

    98.  (DO NOT READ) Don't know
    99.  (DO NOT READ) Refused

    **SKIP LOGIC:**
        • If Q1B = 0; GO TO CONCLUDING STATEMENT

1C.    [if Q1 = 1]  Have you worked twenty shifts or more as a store manager or assistant store manager?

    [if Q1 = 2]  Did you work twenty shifts or more as a store manager or assistant store manager?

    1.  Yes
    2.  No

    98.  (DO NOT READ) Don't know
    99.  (DO NOT READ) Refused

    **SKIP LOGIC:**
        • If Q1C = 2, 98, OR 99; GO TO CONCLUDING STATEMENT

My next questions are about your employment as a store manager or assistant store manager at Starbucks locations in California during the period of June 2015 to the present.  Any other time period you worked for Starbucks should be disregarded when answering the questions.  If you worked at multiple Starbucks locations in California as a store manager or assistant store manager during this time period please answer the questions based on your average experience at the stores.  As a final reminder these questions are only in regards to your employment as a store manager or assistant store manager.  If you held any other job titles at Starbucks, ignore those when answering the questions.

2.      Did you use your personal cell phone for any of your work at Starbucks?

   1.  Yes
   2.  No

   98.  (DO NOT READ) Don't Know
   99.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   • If Q2 = 2, 98 OR 99, SKIP TO Q6

2B.     I am going to read you several situations that may have required you to have your personal cell phone available during your work shifts.  After I read each statement, please answer yes or no with a "yes" meaning you needed to have your personal cell phone available and a no meaning you did not. [**NOTE TO PROGRAMMER:** Yes = 1, No = 2, Don't Know = 98, Refused = 99]

   1.  My supervisor or other Starbucks corporate employee called, e-mailed, texted or instant messaged me on my personal cell phone

   2.  Other store employees or other store managers called, e-mailed, texted or instant messaged me on my personal cell phone

   3.  I used Workplace by Facebook or another group messaging application on my personal cell phone

   4.  I took pictures or videos on my personal cell phone of work situations that needed to be documented

2C.     Did Starbucks ever reimburse you for your personal cell phone expenses?

   1.  Yes, Starbucks reimbursed for all of my cell phone expenses
   2.  Yes, Starbucks reimbursed for a portion of my cell phone expenses
   3.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

[Q3 INTRO]  My next questions are about using your cell phone outside the time of your scheduled shifts when you were clocked out from work.  I will refer to this time as "off-the-clock."  This does not include the time you were clocked out for meal breaks.  I will ask you about your time on meal breaks in a separate section.  Some of the questions will ask you to provide an estimate.  You may estimate in your survey responses but please do not guess.

3.      Did you ever perform the following work-related activities off-the-clock?  Please answer yes or no to each …

1.  Taking work-related phone calls or making work-related phone calls.
2.  Reading, writing or responding to work-related text or instant messages.
3.  Reading, writing or responding to work-related e-mails.
4.  Reading, writing or responding to work-related posts in Workplace by Facebook or another group messaging application.
5.  Taking a work-related photo or video.

[**NOTE TO PROGRAMMER:** Yes = 1, No = 2, Don't know = 98, Refused = 99]

**SKIP LOGIC:**
- If Q3 = 2, 98 OR 99 FOR ALL RESPONSES, SKIP TO Q4 INTRO

3B.     Did your district manager or any other supervisor ever instruct you to NOT perform off-the-clock work?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

3C.     Did you ever have to work off-the-clock as a result of your district manager or any other supervisor calling, texting or instant messaging you on your cell phone while you were off-the-clock?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**

6

- If Q3C = 2, 98 OR 99, SKIP TO Q3E

3D.    How frequently did you have to work off-the-clock as a result of your district manager or any other supervisor calling, texting or instant messaging you on your cell phone when you were off-the-clock?  Would you say … [READ LIST]

1.  Very Frequently
2.  Frequently
3.  Occasionally
4.  Rarely
5.  Never

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

3E.    During a typical work week, how much time would you spend responding to work-related communications on your personal cell phone when you were off-the-clock?

[CODE RESPONSE IN HOURS, MINUTES AND/OR SECONDS]

[ALLOW FOR RANGE AND CODE BOTTOM AND TOP 3H-1 AND 3H-2, RESPECTIVELY]

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

7

[Q4 INTRO]  My next questions are about using your personal cell phone during meal breaks. Meal breaks are 30-minute time periods of your workday when you clock out and are not being paid for this time.

4.      Did you ever respond to work-related communications on your personal cell phone during your meal breaks?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4 = 2, 98 OR 99, SKIP TO Q5 INTRO

4A.     How frequently did you respond to work-related communications on your personal cell phone during your meal breaks?  Please estimate as a percentage of your meal breaks.

[**NOTE TO PROGRAMMER:** If Q4A = 01, enter percentage in variable 4A-1.  If Q4A = 02, enter start of range in 4A-1 and second number in 4A-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4A = 998 OR 999, SKIP TO Q5 INTRO
- If Q4A-1 = 0% AND Q4A IS 01, SKIP TO Q5 INTRO

8

4B.  Which of the following statements best describes how you responded to work-related communications on your personal cell phone during your meal breaks?

1.  It was expected as part of my job duties to respond to work-related communications on my personal cell phone during meal breaks.

2.  I could have waited until my meal break was over to respond to work-related communications on my personal cell phone.

3.  It varied.  I was expected to respond to some work-related communications on my personal cell phone during my breaks and some of my work-related communications I could have waited until after my meal break was over.

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4B = 1, 2, 98 OR 99, SKIP TO Q5 INTRO

Since you told me it varied, I want to find out how often you needed to respond during your break and how often it could have waited.  I will ask this as a percentage of your meal breaks when you received communications on your personal cell phone.

4C.  What percentage of your meal breaks were you expected to respond to the work-related communications during your break?

[**NOTE TO PROGRAMMER:** If Q4E = 01, enter percentage in variable 4C-1.  If Q4C = 02, enter start of range in 4C-1 and second number in 4C-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

98.  (DO NOT READ) Don't know
99.  (DO NOT READ) Refused

9

[Q5 INTRO]  My next questions are about rest breaks.  You do not clock out for rest breaks. They are a ten minute break time when you stay on the clock.

5.      Did you ever respond to work-related communications on your personal cell phone during your rest breaks?

   1.  Yes
   2.  No

   98.  (DO NOT READ) Don't Know
   99.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q5 = 2, 98 OR 99, SKIP TO Q6

5A.     How frequently did you respond to work-related communications on your personal cell phone during your rest breaks?  Please estimate as a percentage of your rest breaks.

   [**NOTE TO PROGRAMMER:** If Q5A = 01, enter percentage in variable 5A-1.  If Q5A = 02, enter start of range in 5A-1 and second number in 5A-2]

   01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
   02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

   998.  (DO NOT READ) Don't know
   999.  (DO NOT READ) Refused

   **SKIP LOGIC:**
   - If Q5A = 998 OR 999, SKIP TO Q6
   - If Q5A-1 = 0% AND Q5A IS 01, SKIP TO Q6

5B.     Which of the following statements best describes how you how felt about responding to work-related requests during your rest breaks?

   1.  It was a necessary part of my job duties to respond immediately to work-related communications on my personal cell phone during rest breaks.

   2.  I could have waited until my rest break was over to respond to work-related communications on my personal cell phone.

   3.  It varied, some work-related communications on my personal cell phone needed to be responded to immediately and some could have waited until I was done with my rest break.

10

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q5B = 1, 2, 98 OR 99, SKIP TO Q5

5C.    What percentage of your rest breaks were you expected to respond to the work-related communications during your break?

[**NOTE TO PROGRAMMER:** If Q5C = 01, enter percentage in variable 5C-1.  If Q5C = 02, enter start of range in 5C-1 and second number in 5C-2]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

98.  (DO NOT READ) Don't know
99.  (DO NOT READ) Refused

11

We are almost finished, I just have a few concluding questions that will be used for statistical purposes.

6. Please think about all the work experiences you have described for me during this survey. How sure are you that the answers you gave me accurately describe your work experiences at Starbucks? Would you say…

    1. Not sure at all
    2. Slightly sure
    3. Moderately sure
    4. Very sure
    5. Completely sure

    98. (DO NOT READ) Don't know
    99. (DO NOT READ) Refused

7. What is the highest level of education you have completed? [DO NOT READ CHOICES]

    1. Less than High School.
    2. GED
    3. High School Diploma
    4. Vocational Degree
    5. Some College
    6. College Degree
    7. Graduate Degree
    8. Other (Specify)

    99. (DO NOT READ) Refused

8. What is your age?

    ENTER AGE

    99. (DO NOT READ) Refused

9. What is your gender?

    1. Male
    2. Female
    3. Nonbinary
    4. Other

    99. (DO NOT READ) Refused

12

10. Prior to my call today, did you know anything about a lawsuit involving Starbucks?

     1. YES

     2. NO

     98. (DO NOT READ) Don't know
     99. (DO NOT READ) Refused

     **SKIP LOGIC:**
- If Q10 = 2, 98 OR 99, SKIP TO CONCLUDING STATEMENT

11. Please tell me, in as much detail as you can, everything you can remember about the purpose of any lawsuit involving Starbucks. I am going to type your answer as you speak it, so it would help me if you speak slowly while I type. Please don't tell me how you learned what you know or who told you – just tell me what you know about the purpose of any lawsuit involving Starbucks.

     TYPE OPEN-ENDED ANSWER

     **[PROBE REPEATEDLY "WHAT ELSE DO YOU REMEMBER ABOUT THE PURPOSE OF ANY LAWSUIT REGARDING STARBUCKS?" UNTIL THE RESPONDENT SAYS "NOTHING"]**

**CONCLUDING STATEMENT:** That's all the questions I have for you. Thank you very much for your help. Would you like me to send you $10 via Amazon gift card?

Amazon
DO NOT READ, Prefers check

EMAIL
It will arrive in about 7 days. What email address would you like it sent to?
CAPTURE AND CONFIRM EMAIL.

Mailing (IF CHECK SELECTED AT CONCLUDING STATEMENT)

What is your mailing address:

Street
City, State Zip

13

# EXHIBIT C



26610 Agoura Road Suite 240, Calabasas, CA 91302
818–591–2408 | www.davisresearch.com

**November 28, 2022**

This report summarizes the services Davis Research provided as well as the research methods followed for the Starbucks manager survey.  Davis Research's role was programming the questionnaire, pre-testing the survey instrument, conducting live phone surveys, monitoring, and validating the interviews and delivering a data file at the conclusion of the project.  Survey design and data analysis was performed by Jeff Petersen.

**Study Design**

52 telephone interviews were conducted with eligible respondents starting on November 14, 2022 and concluding on November 22, 2022. To be eligible for the survey, respondents needed to confirm they were a former or current employee of Starbucks and have worked as a store manager or assistant store manager for Starbucks for at least 20 shifts.  Participants were offered a $10 gift card to participate in an interview that averaged just under 18 minutes in length.

The final questionnaire was programmed into our computer-assisted telephone interviewing (CATI) system, which offers many benefits when conducting surveys by telephone.  CATI randomizes the order names are called, allows appointments to be set and controls skip patterns so only the appropriate questions are asked. The interviewer simply reads each question over the telephone and enters the answers given. The CATI program also performs various quality control functions, including only accepting eligible codes to be entered by an interviewer as well as checking that numeric responses are within a reasonable and allowable range.

**Interviewing Training Procedures**

When hired, interviewers complete a professional interviewer training program, which was designed and updated based on the Insights Association standards.  Prior to beginning work on



26610 Agoura Road Suite 240, Calabasas, CA 91302
818–591–2408 | www.davisresearch.com

the study, all interviewers were required to attend a briefing session where the study was discussed and reviewed in detail.  The briefing provided interviewers with an overview of the study and included a question-by-question review of all items included in the survey.  The briefing also covered best-practice approaches for dealing with different interviewing situations and provided specific instructions to follow when documenting the results of each call attempt.

During fielding, our quality assurance staff conducted ongoing live monitoring of interviews.  Post fielding validation calls were placed to 15% of the survey respondents who received the final survey.

**Data Collection Facilities**

Davis operates two call centers -- a 35-station call center within its office headquarters in Calabasas, California, and a 75-station call-center in Glendale, Arizona.

Most of the telephone listings were expected to be cell phone listings.  To meet current interpretation of TCPA laws, all telephone numbers on the study were hand-dialed by live phone interviewers.

**Sampling Methods**

Davis Research received 5,951 individual contacts to be sampled for this survey effort.  Of those 153 did not have a telephone number, 4 were removed because they were on the Davis Research internal do not call list and 7 did not have a valid area code.  Of the remaining 5,787 contacts, 400 contacts were randomly selected for calling efforts for this project.



26610 Agoura Road Suite 240, Calabasas, CA 91302
818–591–2408 | www.davisresearch.com

**Disposition of Interview Attempts**

A summary of our calling effort on this project are as follows. The statistics represent the last outcome to each phone number at the moment in time that we achieved 52 surveys.

|  | Total |
|---|---|
| **Randomly Selected Phone Numbers** | 400 |
| Total records attempted at least one time | 400 |
|  | 0 |
| **Total Interviews Completed (A)** | 52 |
|  | 0 |
| **\*Refusals (All) (B)** | 40 |
| Invalid telephone numbers / Wrong numbers | 13 |
| **Called but not reached for duration of study (C)** | 293 |
| **Not eligible for survey (D)** | 2 |
|  |  |
| COOPERATION RATE = (A+D)/(A+B+D) | 57% |
| RESPONSE RATE= (A)/(A+B+C) | 14% |

*\* The refusals include 18 people that refused during the introduction process, 16 people that refused after the consent text was read, 5 people that requested to be put on a do not contact list and one person who refused to finish after they had started the survey.*

The cooperation and response rates percentages are within the normal and expected ranges for surveys of this type.  I am prepared to testify about all the information contained in this report.

Bill Davis
Managing Member
Davis Research LLC